1  KAREN A. OVERSTREET
   Bankruptcy Judge
2  United States Courthouse
   700 Stewart Street, Rm. 6301
3  Seattle, WA  98101-1271
   (206) 370-5330
4

5
                    UNITED STATES BANKRUPTCY COURT
6                   WESTERN DISTRICT OF WASHINGTON
                             AT SEATTLE
7
   In re                         )
8                                )      Chapter 11
   EVERGREEN CARDIOLOGY CARE      )
9  CENTER, P.S.                   )
                                  )
10            Debtor.             )
                                  )      Bankruptcy No. 04-20652
11                               )
   _____)
12                               )
   BANNER BANK,                  )
13                               )      Adversary No. A04-01377
                                  )
14                               )
              Plaintiff.         )
15                               )
   V.                            )      **MEMORANDUM DECISION**[1]
16                               )
   EVERGREEN CARDIOLOGY CARE      )
17 CENTER, P.S., DENNIS ENOMOTO, )
   and HANNAH LEAH ENOMOTO aka    )
18 HANNAH LEAH MAHON,             )
                                  )
19            Defendants.         )
   _____)
20
        This matter came before the Court for trial commencing on
21
   December 13, 2004, and continuing on various days until closing
22
   argument on April 21, 2005.  This is an action by Banner Bank
23
   ("Banner Bank" or the "bank") to collect on one promissory note
24
   executed by the debtor, Evergreen Cardiology Care Center, P.S.
25

26  _____

27       [1]  This disposition is not appropriate for publication and may
    not be cited except when pertinent under the doctrine of law of the
28  case or the rules of res judicata, including issue and claim
    preclusion.

    Memorandum Decision - 1

("Evergreen"), and on various guaranty agreements and/or notes
under which the bank claims Dennis Enomoto and/or Hannah Leah Mahon
Enomoto are liable as primary obligors or as guarantors of loans
made to their related entities, Century Stone Homes, Inc. ("Century
Inc."), Century Stone Ltd. ("Century Ltd."), CSH Systems
Technologies, LLC ("CSH"), and Evergreen.  Dr. and Mrs. Enomoto and
their related entities will be referred to collectively hereinafter
as the "Enomoto Entities."  The total amount sought by the Bank is
$5,938,493 at default rates of interest under the loan documents.
The defendants request that certain of the notes at issue be
cancelled and they seek a monetary judgment against the bank for
approximately $6.8 million, including punitive damages.

## I.  JURISDICTION

This court has jurisdiction of this matter pursuant to 28
U.S.C. § 1452, 28 U.S.C. § 1334, and 28 U.S.C. § 157.

## II.  BACKGROUND

A.   The Parties and Related Entities.

Banner Bank is a Washington state bank which was formerly
known as Towne Bank.  Dr. and Mrs. Enomoto are individuals who
reside in King County, Washington.  Dr. Enomoto is a medical doctor
specializing in cardiology.

Mrs. Enomoto formed Century Ltd. in 1985.  She has been the
sole owner and officer of that entity since its formation.  Century
Ltd. was formed as a real estate holding company for the purpose of
holding the real property referred to in this litigation as The
Glen at Emerald Downs ("The Glen").  The Glen was a proposed two-
phase real estate development to construct 25 custom designed homes
based on "green" technology, using environmentally friendly

Memorandum Decision - 2

materials and technologies.  With the purchase of the property
necessary for phase 2 of the Glen in 1997, Mrs. Enomoto testified
that she was intending to be ready to begin constructing homes in
2001 or 2002.

Century Inc. was also a corporation formed by Mrs. Enomoto to
participate in the development of The Glen as a joint venture
partner with Century Ltd.  Century Inc. was the corporation that
was to obtain financing for the development of the project.  Mrs.
Enomoto was the sole shareholder and officer of that entity at all
times relevant to this litigation.

At or around the end of 1998, Mrs. Enomoto formed CSH, a
limited liability company, for the purpose of carrying on the
business of Century Inc.  According to Mrs. Enomoto's testimony,
Century Inc. had completed the construction of three demonstration
homes and CSH was to take over construction of the remaining homes
in The Glen development with financing provided from an industrial
revenue bond.  Upon the formation of CSH, Century Inc. ceased its
operations.  Although Mrs. Enomoto testified that at the time CSH
was formed, all of the assets and liabilities of Century Inc. were
transferred to CSH, no corporate documents showing those transfers
were introduced into evidence.  Mrs. Enomoto's plan was also that
CSH would construct, own and operate a manufacturing facility that
would be used to construct pre-fabricated homes using green
technology.  There is no evidence that a manufacturing facility was
ever constructed or that homes were constructed for The Glen, other
than the three demonstration homes.

Century Inc., Century Ltd. and CSH all shared the same office
and employees, and Mrs. Enomoto controlled all three entities.

Memorandum Decision - 3

1    In 1993, Dr. Enomoto incorporated Evergreen as a personal
2  services corporation for the purpose of conducting his cardiology
3  practice.  Dr. Enomoto was the president and sole shareholder of
4  Evergreen at all times relevant to this litigation.  Evergreen has
5  continued its business operations in chapter 11.
6  B.  Procedural Background.
7     Banner Bank commenced this litigation against the defendants
8  in King County Superior Court.  The defendants filed an answer and
9  asserted affirmative defenses and counterclaims.  The action,
10  entitled Banner Bank v. Dennis Enomoto and Hannah Leah Mahon, aka
11  Hannah Leah Mahon Enomoto, and Evergreen Cardiology Care Center,
12  P.S., Cause No. 02-2-23502-6 SEA (the "State Court Case"), was
13  pending when Evergreen filed its petition under Chapter 11.
14  Evergreen removed this action pursuant to 28 U.S.C. 1452(a) by
15  filing its notice of removal on August 12, 2004.
16     The King County Superior Court had conducted significant
17  proceedings prior to removal of the action to this Court and had
18  entered an Order Granting Summary Judgment and Judgment Against
19  Evergreen Cardiology Care Center, P.S. on December 30, 2003 in
20  favor of Banner Bank (the "Summary Judgment").[2]  In the Summary
21  Judgment, the superior court held that Banner Bank had a valid
22  claim against Evergreen under what is referred to as the "M Loan"
23  note (see page 11 infra) and that the note was secured by a valid
24  and enforceable security interest in virtually all of Evergreen's
25  assets.  The state court entered judgment against Evergreen in the
26
27  _____
28     [2]  The Summary Judgment is attached to the Declaration of
     Bruce Nelson filed in this adversary proceeding as docket No. 72.

Memorandum Decision - 4

amount of $562,772.39.[3]  The Summary Judgment states that the

judgment amount is to accrue interest at 24% per annum.  In the

Summary Judgment, however, the superior court ordered that

"Plaintiff is precluded from executing on this Judgment prior to an

Order of this Court that expressly lifts this preclusion or upon

final resolution of all remaining claims in this case."  Summary

Judgment at p. 3, ¶ 2.  In addition, an interlineation on page two

of the Summary Judgment states "This portion of this case appeared

to be a simple collection matter on a note which was not disputed

on grounds of authenticity."  In proceedings before trial, this

Court held that the Summary Judgment is a final order entitled to

both *res judicata* and collateral estoppel effect in this

proceeding.[4]

Banner Bank claims that the defendants have breached

promissory notes and guaranties.  The defendants have raised the

following defenses to Banner Bank's claims: ultra vires action by

the bank, satisfaction and release, forgery/unauthorized

signatures, undue influence, coercion/duress/business compulsion,

breach of fiduciary duty, dishonesty and deception, failure of

consideration, negligent account of monies owed, novation, fraud

and/or misrepresentation, estoppel, and violation of funds transfer

procedures under RCW 62A.4A-101 *et seq.*, including RCW 62A.4A-

201; 202; and 203.  In addition to these defenses, the defendants

---

[3]  This amount includes principal, interest and late charges
as of November 21, 2003 in the amount of $551,456.37, plus
attorneys fees of $10,816, and costs of $500.00.

[4]  The Court hereby incorporates herein by reference its prior
rulings on *res judicata* and collateral estoppel related to its
order of December 13, 2004 (Docket no. 131).

Memorandum Decision - 5

have made numerous counterclaims, including breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duties, interference with business opportunities, fraud, and equitable subordination, 11 U.S.C. § 510(c).

By order dated December 13, 2004, this Court held that the defendants had no right to a jury trial and that Banner Bank has a valid and perfected security interest in virtually all of the assets of Evergreen, including without limitation, insurance proceeds derived from the loss or destruction of Evergreen's inventory, chattel paper, accounts, equipment and general intangibles (the "Collateral").[5]

C.    The Bankruptcy Proceeding.

Evergreen filed under Chapter 11 of the Bankruptcy Code on August 12, 2004.  No plan or disclosure statement has been filed in Evergreen's case because its ability to reorganize depends upon resolution of this adversary proceeding with Banner Bank.  The Court has authorized Evergreen to use Banner Bank's cash collateral pursuant to numerous orders pending the outcome of this trial.

D.    The Notes and Guaranties at Issue.

Banner Bank seeks to collect on eight loans owed by the various defendants.  The total amount of the bank's claim is

---

[5]    The order states that there was a question of fact concerning whether all the insurance proceeds currently sought by Evergreen from its insurance policy are attributable to the loss of Banner Bank's Collateral.  The Court held that it would be the burden of Evergreen to prove at trial that some portion of the proceeds of any insurance policy were not attributable to the loss of the Collateral.  At trial, however, counsel for Evergreen conceded that any insurance proceeds would, in fact, be traceable to the Collateral.

Memorandum Decision - 6

1 $5,938,493 as of December 15, 2004, including default interest.

2 The eight loans at issue are described generally in this section.

3     1.  <u>The H Loan</u>.  What was referred to at trial as the "H Loan"

4 is memorialized by a Promissory Note dated as of July 19, 2001 in

5 the principal amount of $496,775 (the "H Loan Note").  Ex. P-1-O.[6]

6 The loan number for the H Loan is #169013075 and the account number

7 is #100831.  The H Loan Note appears to be signed by Mrs. Enomoto

8 as the President of the borrower, "Century Stone Homes

9 Corporation".  Mrs. Enomoto testified at trial, however, that she

10 did not sign this note and believed it to be a forgery.

11     The H Loan Note states that it matured on September 30, 2001.

12 The bank contends that on the default date, which the bank claims

13 was October 1, 2001 (*see* Ex. P-30), the outstanding balance of the

14 note was $496,775.  With interest at the default rate of interest

15 (24%), the bank claims the total amount due as of December 15, 2004

16 was $879,278.  *See* Ex. P-30.

17     Banner Bank asserts that Mrs. Enomoto guarantied the H Loan

18 Note pursuant to a Commercial Guaranty dated October 17, 2000 and

19 which is in evidence as Exhibit P-11-O (the "10/17/00 Guaranty").

20 The 10/17/00 Guaranty references "Century Stone Homes Corporation"

21 as the borrower and Mrs. Enomoto as the guarantor.  Towne Bank is

22 the referenced lender.  The guaranty appears to be signed by Mrs.

23 Enomoto.  At trial, she testified that the signature on the

24 10/17/00 Guaranty is hers, but that she did not recall signing the

25
_____

26     [6]  All exhibit references herein, unless otherwise noted, are
to exhibits admitted at trial.  The notation "P" refers to
27 plaintiff's exhibits and the notation "D" refers to defendants'
exhibits.  In addition, the notation of "O" after an exhibit number
28 references the original document admitted into evidence rather than
a copy.

Memorandum Decision - 7

guaranty.  In addition, Mrs. Enomoto testified that she would not
have signed this guaranty in October of 2000 because, as of that
time, Century Inc. was no longer operating.

There is also a Continuing Guaranty Agreement dated August 20,
1996, in evidence as Ex. P-14b, which appears to be signed by both
Dr. and Mrs. Enomoto and which, by its terms, obligates them to
guaranty all loans made by Towne Bank to Century Inc.  The
signatures of Dr. and Mrs. Enomoto on this agreement (the "8/20/96
Guaranty") were notarized.  At trial, Dr. Enomoto testified that he
did not recall signing this guaranty agreement.  Mrs. Enomoto did
not testify about this agreement.

Banner Bank contends that the H Loan is secured by collateral
pledged by Century Ltd. pursuant to a Commercial Security Agreement
dated July 19, 2001, in evidence as Ex. H-20 (the "H Loan Security
Agreement").  That agreement bears the signature of Mrs. Enomoto as
president of Century Ltd. and "Century Stone Homes Corporation."
At trial, Mrs. Enomoto testified that these signatures are
forgeries.

2.  The J Loan.  The J Loan, as it was referred to at trial,
is memorialized by a Promissory Note dated as of July 19, 2001 in
the original principal amount of $600,000 (the "J Loan Note").
Ex. P-2-O.  The loan number for the J Loan is 169030947 and the
account number is 100831.  The J Loan Note appears to be signed by
Mrs. Enomoto as the President of the borrower, "Century Stone Homes
Corporation".  Mrs. Enomoto testified at trial that the signature
on Ex. P-2-O is hers, but that she was only given page two of the
document and did not know what she was signing.

Memorandum Decision - 8

The J Loan Note states that it matured on September 30, 2001. The bank contends that on the default date, which the bank claims was October 1, 2001, the outstanding principal balance of the note was $599,934. With interest at the default rate (24%), the bank claims the total amount due as of December 15, 2004 was $1,061,867. *See* Ex. P-30.

Banner Bank relies on the same guaranties described in the preceding section (the 10/17/00 Guaranty and the 8/20/96 Guaranty) to support its claim that Dr. and Mrs. Enomoto guaranteed the indebtedness under the J Loan. The bank also relies on the 7/19/01 Security Agreement as the agreement by Century Ltd. to pledge collateral in support of the J Loan.

3.  <u>The K Loan</u>.  The K Loan, as it was referred to at trial, is evidenced by a Promissory Note dated July 19, 2001, with a stated maturity date of September 30, 2001 (the "K Loan Note"). Ex. P-3-O.  The note refers to Loan #169024577 and account #105622. The original principal amount of the note is $476,817.30, which the bank contends was due on the default date of October 1, 2001.  With interest at the default rate of 24%, the bank's claim is $843,953. The K Loan Note bears the signature of Mrs. Enomoto as the Manager of the borrower "CSH Systems Technologies, L.L.C."  At trial, Mrs. Enomoto testified that the signature on page two of the K Loan Note is authentic, but she claims not to have seen page one of the note when she signed it.

Exhibit P-12-O is the Commercial Guaranty dated April 10, 2001, which would evidence Mrs. Enomoto's personal guaranty of the loans by the bank to CSH (the "4/10/01 CSH Guaranty").  Although Mrs. Enomoto admitted that her signature appears on page two of the

Memorandum Decision - 9

guaranty, she testified that she did not recall signing the 4/10/01
CSH Guaranty nor when it might have been presented to her.  There
is also a guaranty of CSH debt by Mrs. Enomoto in evidence as
Ex. P-14a.  That guaranty, which is dated June 17, 1999 is signed
by Mrs. Enomoto (the "6/17/99 CSH Guaranty") and notarized as of
the same date.  Mrs. Enomoto did not deny that her signature on
this guaranty was valid.  There is no evidence that Dr. Enomoto
personally guarantied the K Loan.

In evidence as Ex. K-9 is a Deed of Trust dated June 17, 1999,
executed by the grantor, Century Ltd., in favor of Towne Bank, as
beneficiary, which pledges to Towne Bank an interest in property
commonly know as Marine View located in Pierce County, Washington.
The operative language of the Deed of Trust (hereinafter referred
to as the "Marine View Deed of Trust") states that it is to secure
all obligations of the borrower, CSH, under a note dated June 17,
1999 in the principal amount of $328,844.48 and all renewals and
extensions of that note.  The deed of trust was recorded in the
real property records of Pierce County on July 6, 1999 under
recording number 9907060124.

Mrs. Enomoto denied having executed the Marine View Deed of
Trust, although her signature on the deed of trust as President of
Century Ltd. is notarized as of June 17, 1999.

4.  The L Loan.  Banner Bank seeks to collect funds advanced
under the L Loan pursuant to a Promissory Note dated April 10,
2001, with a stated maturity date of October 11, 2001 in the
original principal amount of $300,000 (the "L Loan Note").  This
note, the original of which is Ex. P-4-O, refers to the L Loan as
loan #169033057 and account #105622.  According to the bank, the L

Memorandum Decision - 10

Loan Note was in default as of October 12, 2001 and principal in the amount of $239,931 was due. At the default interest rate of 24%, Banner Bank's total claim under the L Loan Note as of December 15, 2004 was $422,936.

The L Loan Note bears a signature of Mrs. Enomoto as the Manager of CSH. Mrs. Enomoto testified that her signature appears on the L Loan Note, but that she did not recall seeing page one of the note.

The bank contends that the L Loan was guarantied by Mrs. Enomoto pursuant to the 4/10/01 CSH Guaranty and the 6/17/99 CSH Guaranty. There is no evidence that Dr. Enomoto guarantied the L Loan.

5. <u>The M Loan</u>. The M Loan is memorialized by a Promissory Note dated December 19, 2001 with a maturity date of June 20, 2002 in the original principal amount of $408,592.64 (the "M Loan Note"). Ex. P-5-O. The borrower under the M Loan Note is the debtor, Evergreen, and the note makes reference to loan #72000910 and account #E002971. Dr. Enomoto signed the note as the President of Evergreen and there is no dispute that his valid signature appears on the note. As noted above, the Superior Court granted summary judgment on this note in the amount of $562,772.39. According to Ex. P-30, the bank claims that the total amount due under the M Loan, with interest at 24% as of December 15, 2004, is $643,909.

The state court held that the M Loan Note is secured by a valid and perfected security interest in the Collateral. The bank submitted evidence of perfection of its security interest in Ex. P-13a. Dr. and Mrs. Enomoto personally guarantied the M Loan

Memorandum Decision - 11

pursuant to a Commercial Guaranty dated December 19, 2001 (the "Evergreen Guaranty"). Ex. P-10-O. They do not contest their signatures on the Evergreen Guaranty. Instead, they contend that the M Loan was procured through fraud on the bank's part. Recognizing that this Court held in prior proceedings that the Summary Judgment of the state court as to the M Loan Note and Collateral was *res judicata* in this proceeding, Evergreen seeks a setoff against the amount of the state court judgment for damages suffered by Evergreen on account of fraudulent conduct by the bank. Evergreen also seeks to equitably subordinate the claim of Banner Bank to unsecured creditors under Bankruptcy Code § 510(c).

6. <u>The N Loan</u>. The N Loan is a loan alleged to have been made to Dr. and Mrs. Enomoto personally. The loan is evidenced by a Promissory Note dated July 24, 2001 with a maturity date of September 30, 2001 in the original principal amount of $492,588.59 (the "N Loan Note"). The note makes reference to L loan #169029287 and account #100836 and bears the signatures of both Dr. and Mrs. Enomoto. Dr. Enomoto testified that the signature on the note "probably" is his. Mrs. Enomoto testified that although her signature appears on page 2 of the N Loan Note, she did not sign the note.

According to Ex. P-30, the Enomotos defaulted under the N Loan Note on October 1, 2001, at which time a balance in the amount of $492,589 was due. With interest at the default rate of 18%, Banner Bank claims that $777,049 was due as of December 15, 2004.

7. <u>The O Loan</u>. Banner Bank made the O Loan to Mrs. Enomoto personally. The O Loan is evidenced by a Promissory Note dated July 17, 2001 with a maturity date of September 30, 2001 and an

Memorandum Decision - 12

original principal balance of $490,000 (the "O Loan Note").  Ex. P-7-O.  Exhibit P-30 reflects that, as of the alleged default date of October 1, 2001, principal in the amount of $487,614 was due under the O Loan Note.  With default interest at the rate of 18% to December 15, 2004, the bank claims $769,201 in total debt.

Mrs. Enomoto admitted at trial that she signed the O Loan Note and that her signature on the note is valid.  She contended in her testimony, however, that the bank's loan officer, Rory O'Flaherty, represented to her at the time she signed the note that the funds advanced would be used to pay off in full all of the corporate debt then owed by CSH, Century Inc. and Century Ltd. to the bank.  This defense is discussed below in Section IV.C.3 *infra*.

8.  <u>The P Loan</u>.  The P Loan is evidenced by an Executive Line of Credit agreement dated August 8, 2000, the original of which is in evidence as Ex. P-8-O (the "P Loan Agreement").  According to the P Loan Agreement, the line of credit was available to Dr. Enomoto up to a maximum credit limit of $350,000 and was due and payable in full on August 8, 2001.  The agreement refers to loan #169030244 and account #100836.  The P Loan Agreement bears the signature of Dr. Enomoto.  In his testimony, Dr. Enomoto stated that he believed the signature to be his; but because it was on a page by itself, it could have been fraudulently attached to a different document.  At the same time, Dr. Enomoto testified that he intended to take out the P Loan because he believed that the proceeds of the loan would be used to pay off all indebtedness of Evergreen as of August, 2000.  Under the terms of the P Loan Agreement, advances could be requested by telephone, by mail or in person.  As to telephone requests for advances, the agreement

Memorandum Decision - 13

states: "[Y]ou acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine."

According to Ex. P-30, the bank claims that as of the default date of August 9, 2001, the amount owed was $336,926; and, with default interest of 18% to December 15, 2004, the total amount due was $540,300.

E. The Defendants' Relationship With Banner Bank.

The defendants' banking relationship with Banner Bank, then known as Towne Bank, commenced initially in 1996. Pursuant to a Promissory Note dated August 20, 1996, Century Inc. and Century Ltd. borrowed $600,000 from Banner Bank to fund construction at The Glen. Mrs. Enomoto testified that she had several loan proposals at that time but she selected Banner Bank because of its expertise with small businesses. The loan officer on this initial loan was Rory O'Flaherty, who at that time was a senior loan officer. The lending relationship grew as new loans were made to the various Enomoto Entities and existing loans were renewed. Both Dr. and Mrs. Enomoto testified that they relied on Rory O'Flaherty heavily for advice about their lending options and that he exercised great control over their loans and accounts. The evidence supports their assertion that Mr. O'Flaherty was at that time an experienced loan officer who was well liked both by bank personnel and his customers.

Memorandum Decision - 14

Mr. O'Flaherty was the account officer for the Enomotos from 1996 to August of 2001. According to the testimony of Bruce Nelson,[7] a bank officer called by plaintiff, during that period of time Mr. O'Flaherty served as an officer of the bank, a senior vice president, a branch manager and a division manager with three branches reporting to him. Mr. O'Flaherty had significant lending authority and was also at various times a member of the bank's senior loan committee. While Mr. O'Flaherty was acting as the account officer for the Enomotos, he worked out of the Woodinville, Washington branch.

Mrs. Enomoto testified that the purpose of the Banner Bank loans to Century Ltd. and Century Inc. was to fund the various construction phases of The Glen, but that she was intending to get funding from an industrial revenue bond for the final phase of the project and for the construction of a manufacturing facility. She testified that near the end of 1998 and the beginning of 1999, a revenue bond, which Mrs. Enomoto later testified was $2 million, was approved and that she formed CSH to use the bond to fund the construction of a manufacturing facility to construct custom homes. There are no documents in the record, however, evidencing the existence or terms of this bond. While Mrs. Enomoto testified that a bond had been "approved," she also testified that the bond funding never came through because Banner Bank and Rory O'Flaherty never provided her with the necessary bank statements that she needed as part of her funding request. She also testified that in the same time period, the bank loans to Century Inc. were "rolled

_____

[7] At the time of trial, Mr. Nelson was a senior vice president of Banner Bank and the manager of Special Credits.

Memorandum Decision - 15

over" to CSH because Century Inc. had ceased business and CSH was to become the operating entity.

In 1999, Dr. Enomoto hired a new office manager for Evergreen named Jan Thomas. At Evergreen, according to the testimony of Dr. Enomoto, Thomas' specific duties included hiring, screening and recruiting personnel, managing day-to-day operations, filling in at the clinic front desk when needed, opening the mail and acting as an interface with Evergreen's bookkeeper and accountant and with Banner Bank. Although Ms. Thomas did not have authority to sign agreements and documents for Evergreen or to make final decisions on financial matters, she acted as an advisor to Evergreen and Dr. Enomoto on these matters.

Around September or October of 2000, Mrs. Enomoto also hired Jan Thomas to assist Mrs. Enomoto's companies in closing the industrial revenue bond. From October of 2000 to July or August of 2001, Mrs. Enomoto testified that she was spending nearly all of her time in Arizona working on The Glen project. During that time, Dorothy Brumberg acted as the bookkeeper for Century Ltd. and CSH and managed the Enomotos' personal accounts. During the same time, Ms. Thomas worked on the bond and financing matters and with contractors and others. Mrs. Enomoto testified that Ms. Thomas gave her weekly oral or written reports of progress on the bond financing and that Ms. Thomas met regularly with Mr. O'Flaherty to discuss a detailed checklist and the scope of activities.

According to Mrs. Enomoto, Ms. Thomas was also directly involved in the process by which the Enomotos would sign Banner Bank loan documents. According to both Dr. and Mrs. Enomoto, Mr. O'Flaherty would either send loan documents to Evergreen's

Memorandum Decision - 16

office or Ms. Thomas would pick the documents up from
Mr. O'Flaherty and take them to Evergreen.  After the loan
documents were signed, Ms. Thomas would return them to
Mr. O'Flaherty at the bank.  Mrs. Enomoto repeatedly described the
process of executing loan documents as a rushed process, whereby
numerous documents would be brought to Evergreen with instructions
that the Enomotos were to execute the documents quickly and get
them back to the bank.  The Enomotos never kept copies of these
loan documents; instead, according to their testimony, they relied
on Mr. O'Flaherty to return "epistolis" copies of the documents
after their execution.[8]  Mrs. Enomoto testified that she was asked
to sign multiple copies of the same document and Mr. O'Flaherty was
to return a signed copy to them.  Mrs. Enomoto never made any
written request of Mr. O'Flaherty, or anyone else at the bank, for
copies of loan documents or for the "epistolis" copies to which she
referred.

On cross-examination, Mrs. Enomoto was asked to refer to her
deposition transcript from December 1, 2004.  Her deposition
testimony was somewhat different from her testimony at trial.  At
deposition, Mrs. Enomoto testified that she signed numerous notes
and other loan documents that had not been completely filled in,
*e.g.,* note dates and loan numbers were missing.  Ex. P-19, pp. 82-
89.  She also testified that Mr. O'Flaherty insisted that she sign
multiple signature pages to promissory notes and that she sign
promissory notes "in blank."  *Id.* at p. 81, 82.  Mrs. Enomoto also

---

[8]  This Court can find no definition in Webster's dictionary
or any other source for the term "epistolis," a term Mrs. Enomoto
used repeatedly in her testimony.  The Court can only assume that
she meant counterpart copies of some sort.

Memorandum Decision - 17

testified at her deposition that she had instructed Ms. Thomas to make copies of every document leaving the office and that it was Ms. Thomas' responsibility to make these copies. *Id.* at p. 87. At trial, Mrs. Enomoto testified that she and her husband trusted Mr. O'Flaherty so they just signed what he put in front of them.

On August 20, 2001, Judy Silvers, acting as the accountant for CSH, sent Mr. O'Flaherty a letter regarding the financial statements of the Enomoto Entities. Ms. Silver's letter is Ex. P-32. According to the testimony of Mrs. Enomoto, Ms. Silvers was working on a contract basis to try and reconcile different accounts so CSH could close a new loan with American Home Loans. In the letter Ms. Silvers reported that she was having considerable difficulty reconciling the books and records and, in particular, that the records concerning real estate purchases "had no clear history or audit trail," "...proper trails were not established or recorded between the three Companies & the Enomoto's in prior year Financial Reports," and "[s]hareholder Loans due to/from each company need to be audited to tie properly with Loans owed to Banner Bank & actual amounts owed to Dr. & Mrs. Enomoto." Ex. P-32, p. 1. Mrs. Enomoto testified that what Ms. Silver "meant" in this letter was that she was missing the proper statements and transaction reports for the various loans from Banner Bank, and therefore she could not reconcile the intercompany transfers that had been made by Mr. O'Flaherty. Nothing in the letter, however, challenges the intercompany transfers, requests account statements or transaction reports from Mr. O'Flaherty, or raises an issue about the bank's calculation of the loan balances.

Memorandum Decision - 18

About the same time, the bank was learning some things about Mr. O'Flaherty. Mr. Nelson testified that on the Thursday preceding Labor Day weekend of 2001, he received a call from a representative of Banner Bank's documentation division who wanted to discuss two abnormal-appearing transactions. The transactions involved the transfer of money from one entity to another unrelated entity after which the transaction was reversed to make it look like the transfer had never occurred. The loan officer implicated in the transfer was Mr. O'Flaherty. Mr. Nelson contacted the bank's legal counsel, Peter Goddu. Mr. Goddu and a bank auditor initially confronted Mr. O'Flaherty on Friday, August 31, 2001, at which meeting Mr. O'Flaherty referred to the questionable transactions as "mistakes." *See* Proof of Loss Form, Declaration of Mr. Goddu, Ex. D-23. Mr. Goddu, Mr. Nelson and others, however, continued investigating these transactions over the Labor Day weekend after meeting on Saturday, September 1, 2001. Other questionable transactions were discovered, at least one of which related to the Enomotos. On Sunday, September 2, 2001, Mr. O'Flaherty initiated a meeting with Mr. Goddu in which Mr. O'Flaherty admitted his wrongdoing. *Id*. and testimony of Peter Goddu. Mr. O'Flaherty resigned after Labor Day weekend 2001.

Phil Corneil, another Banner Bank loan officer, took over the Enomotos' accounts after Mr. O'Flaherty's resignation. Like Mr. O'Flaherty, Mr. Corneil was a senior vice president at Banner Bank and a branch manager. Mr. Corneil and Mr. Nelson met with Dr. and Mrs. Enomoto and Jan Thomas on September 21, 2001. According to Mr. Nelson's testimony, they explained to the Enomotos that Mr. O'Flaherty was no longer at the bank and that Mr. Corneil would be

Memorandum Decision - 19

taking over their accounts.  The Enomotos were advised that
although Mr. O'Flaherty had apparently allowed many overdrafts on
the Enomotos' accounts to occur, those overdrafts would no longer
be allowed by the bank.  The Enomotos advised that they wanted
another $1.7 million in order to continue development efforts at
The Glen, but they were advised that the bank would not extend any
new loans to them.  Although the Enomotos inquired about the
balance of their loan accounts, Mr. Nelson did not recall any
account-by-account discussion at this meeting.  He testified that
the Enomotos were told that the loans were all cross-defaulted and
that the bank had the right to call all the loans and pursue all of
its remedies.  He recalled that the Enomotos also raised questions
about the Evergreen loan and they discussed Evergreen's cash flow,
deposits to the bank control account and additional cash needs.
According to Mr. Nelson, neither Dr. nor Mrs. Enomoto, nor Ms.
Thomas, told them at the meeting that they had not been getting
their loan and account statements regularly.  Dr. Enomoto stated
only that he thought some of the information they received was not
accurate, and Mr. Corneil agreed to provide them with any
information they needed.  Mr. Corneil requested a plan from the
Enomotos as to how their loans were going to be repaid.

     Mr. Nelson's notes from the September 21 meeting are Ex. D-14.
These notes reflect that the Enomotos raised some concerns about
the amount of their outstanding loans and argued that the bank
needed to honor the commitments Mr. O'Flaherty had made to them
regarding their real estate development project.  Mr. Nelson's
notes indicate that the Enomotos were advised that the bank could
not justify their loans and that Dr. Enomoto responded that they
Memorandum Decision - 20

needed more time to find other financing.  The notes also reflect
that Ms. Thomas claimed to have six uncashed cashier's checks
totaling $41,655 that could be voided to free up additional dollars
that were needed to fund current expenses.  She noted that she was
not sure on which accounts these checks had been written.

Mrs. Enomoto testified that at the September 21 meeting, she
and her husband expressed surprise at the claim that the bank's
loans exceeded $3 million, and that they questioned whether loans
had been had properly paid off and whether balances on notes rolled
over were correct.  She said she believed the loans totaled only
about $900,000.  She testified that she told Mr. Corneil and Mr.
Nelson that because of the rolling-over of the notes, the balances
were hard to track and she wanted information about the loan
balances.  She testified that Mr. Corneil and Mr. Nelson did not
provide her with information substantiating the loan balances after
the meeting.

Mr. Corneil's recollection of the September 21 meeting was
largely the same as Mr. Nelson's.  The biggest concern he expressed
at the meeting was that the Enomotos were making deposits into the
bank control account only twice a month and were incurring
significant and unnecessary overdraft fees as a result.  He
advocated for more frequent deposits into the bank control account
to avoid these fees.  He did not recall the Enomotos expressing
surprise over the loan balances or telling him they had not been
receiving their loan and account statements on a regular basis.
Mr. Corneil admitted, however, that the Enomotos did ask for some
copies of statements, loan history transaction detail and copies of
promissory notes.  These were provided to the Enomotos after the

Memorandum Decision - 21

meeting.  Mr. Corneil further testified that the Enomotos never
expressed any concerns about this information and never notified
him in writing that they disputed the loan balances until the
litigation was commenced by the bank.  Mr. Corneil left the meeting
believing that he would receive from the Enomotos a formal plan
detailing how they would repay the loans; however, he never
received such a plan.  Instead, he received only assurances that
the Enomotos were seeking financing from other lending sources.[9]

As of the time of the September 21 meeting, both Mr. Nelson
and Mr. Corneil knew of the investigation of Mr. O'Flaherty and
knew that at least two of the questionable transactions involved
accounts of the Enomotos.[10]  On the instructions of bank management,
however, neither Mr. Nelson nor Mr. Corneil disclosed any of this
information to the Enomotos.  Mr. Nelson testified that, based upon
his investigation, as of the date of the meeting the transactions
that pertained to the Enomotos' accounts had been reversed with no
damage to them.  He therefore did not feel it was necessary to
disclose the transactions to them.

On September 26, 2001, the bank hired RSM McGladrey, Inc.
("RSM"), an independent accounting and auditing company, to
investigate Mr. O'Flaherty's "kiting" and "irregular" activities.
The next day, September 27, 2001, Mr. Goddu issued a default letter

_____

[9]   The bank offered into evidence Ex. P-41, P-42 and P-43,
written communications from Mrs. Enomoto to Mr. Corneil after the
September 21, 2001 meeting.

[10]   Mr. Nelson testified that as of the time of the meeting, he
was aware of two questionable transactions involving the Enomoto
accounts.

Memorandum Decision - 22

to the Enomotos and their related companies.  The letter identified
the following defaults under the Enomoto loans:

1. The P Loan (line of credit to Dr. Enomoto) matured on
   August 8, 2001 and was due and payable in full.

2. The N Loan (personal loan to Dr. and Mrs. Enomoto) would
   mature on September 30, 2001 and payments were more than
   20 days past due.

3. The O Loan (to Mrs. Enomoto) would mature on
   September 30, 2001 and the default under the N Loan
   constituted a default under the O Loan.

4. The K Loan (to CSH), guarantied by Mrs. Enomoto, was in
   default because of delinquent interest payments more than
   20 days past due.

5. The L Loan (to CSH), guarantied by Mrs. Enomoto, was
   declared in default because of the default under the K
   Loan.

6. The H Loan (to Century Inc.), guarantied by Dr. and Mrs.
   Enomoto, was in default because of interest payments more
   than 20 days past due.

7. The J Loan (to Century Inc.), guarantied by Mrs. Enomoto,
   was in default because of interest payments more than 20
   days past due.

8. Loan number 169030236 (a predecessor to the M Loan to
   Evergreen), guarantied by Dr. and Mrs. Enomoto, was not
   declared in default; but notice was given that if the
   Enomotos failed to honor their guaranties on the other
   loans, such failure would constitute a default under this
   loan.

9. Loan number 169013067 (a predecessor to the M Loan to
   Evergreen), guarantied by Dr. and Mrs. Enomoto, was not
   declared in default, but notice was given that if the
   Enomotos failed to honor their guaranties on the other
   loans, such failure would constitute a default under this
   loan.

Ex. D-118.  The letter concluded with a demand for a total amount
of $3,649,220, consisting of $3,591,721.78 in principal, $52,093.24
in interest, and $5,404.80 in late charges.  Even though the letter
did not declare Loan numbers 169030236 and 169013067 in immediate

Memorandum Decision - 23

default, the total amount claimed includes $412,207.38 attributable to those two loans.

There is no evidence of any written response by the Enomotos to Mr. Goddu's demand letter of September 27, 2001. Mrs. Enomoto testified that she asked her employee, Debby Gallaher, to try to "make sense of the letter," but she did not believe they were in default at the time of the letter. The next written communication between the parties appears to be an October 18, 2001 "to whom it may concern" letter created by Mr. Corneil at Mrs. Enomoto's request. Mrs. Enomoto obtained a credit report in connection with a loan from another lender she was seeking and she discovered one or two "30-days late" references to Banner Bank loans. Mrs. Enomoto contacted Mr. Corneil and asked him to check the bank's records. In his October 18 letter, which is Ex. D-8, Mr. Corneil notes that the bank had "apparently" reported the Enomotos' loans as "delinquent on several occasions," but then goes on to say that the bank's experience with the Enomotos had been "favorable" and that "the delinquencies reported were due entirely to an error on our [the bank's] part." The letter concludes, "In fact, these loans should not have been reported to our credit agency as they are business loans." The re line to the letter, however, refers only to the N Loan, which was declared in default in Mr. Goddu's September 27, 2001 letter and Loan number 169022274, which was a predecessor loan to the P Loan and was not mentioned in Mr. Goddu's demand letter. Mrs. Enomoto testified that after receiving the letter she was perplexed as she had not been notified of any errors related to the loans. Mr. Corneil testified that he prepared the letter at the request of Mrs. Enomoto, who contacted him to say she

Memorandum Decision - 24

was working on alternative sources of financing and needed to clarify some issues on her credit report that indicated identity theft.  Mr. Corneil testified that the letter referred to a period four to six months earlier when the loans were not in default.

Mrs. Enomoto testified that at the time of her November 14, 2001 fax to Mr. Corneil, Ex. P-42, she suspected that something might "not be right" with Ms. Thomas, because of Ms. Thomas' failure to provide documents that Mrs. Enomoto had requested.  On November 19, 2001, RSM issued a report of its investigation of Mr. O'Flaherty's activities at the bank.  The report is Ex D-111.  The report describes the investigation conducted by RSM and its findings.  The RSM report confirms Mr. O'Flaherty's creation of fictitious transactions, his manipulations of customer accounts, his creation of a false tax return for a customer and his participation in a check kiting scheme by a bank customer.  The report describes the typical account manipulation by Mr. O'Flaherty as follows:

> Each manipulation involved posting a loan advance to a borrower's account with the offsetting entry to another customer's overdrawn deposit or past due loan account. The effect of this transaction was a temporary fix to bring a customer's deposit account positive or loan balance current.

Ex. D-111, p.2.  One of RSM's findings is that some of the transactions went unchallenged even though other employees at the bank knew of them, because "they all [these other bank employees] also stated they had the utmost confidence in Mr. O'Flaherty."  Ex. D-111, p. 4.  RSM concluded that:

> All false entries were subsequently reversed and the borrowers made "whole."  No direct dollar loss was sustained as a result of the fictitious transactions.

Memorandum Decision - 25

1

2  Ex. D-111, p.2.  Ms. Didi Howe, the director of RSM's risk

3  management group, testified extensively at trial about the report.

4  She worked directly on the investigation that led to the issuance

5  of the RSM report.[11]

6      A month later, in December of 2001, Mrs. Enomoto retained

7  Toyer & Associates, a forensic accounting firm, to investigate not

8  only the Banner Bank transactions but also potential employee

9  dishonesty claims involving Ms. Thomas and other employees.  In

10  January of 2002, Ms. Thomas was fired from her positions with all

11  of the Enomoto entities for suspected fraud, embezzlement and

12  malfeasance.  Exhibit P-23 is Evergreen's May 20, 2002 report for

13  insurance purposes of the business losses attributable to

14  fraudulent conduct by one or more of Evergreen's employees,

15  including Ms. Thomas.  In addition, Ex. P-24 is a letter prepared

16  by counsel for Evergreen which identifies nearly $600,000 in losses

17  suffered by Evergreen as a result of employee misconduct.  The

18  letter describes numerous fraudulent employee schemes, most of

19  which implicate Ms. Thomas in some way and which involve many of

20  Evergreen's employees previous to Jan Thomas.  The letter describes

21  seven fraudulent schemes:  office expense fraud, payroll/timesheet

22  fraud, medical/dental benefit fraud, accounts receivable fraud and

23  loan/banking manipulations.  The letter describes how Jan Thomas,

24  with her extensive control of Evergreen's finances and financial

25  information, could perpetrate these various frauds on Evergreen.

26  _____

27      [11]  The notes of Ms. Howe's separate meetings with Bruce Nelson
    and Phil Corniel on September 28, 2001, at which she obtained

28  background material about the bank's internal investigation, are in
    evidence as Ex. D-146.

Memorandum Decision - 26

The letter asserts that Evergreen is entitled to in excess of
$500,000 under the insurance policy, including audit costs.[12]

Mrs. Enomoto testified extensively about how she believed Ms.
Thomas had perpetrated the same kind of fraudulent schemes as those
described in Ex. P-24 against her companies. Mrs. Enomoto
testified that Ms. Thomas and Mr. O'Flaherty were collaborating to
embezzle hundreds of thousands of dollars from Century Inc. and
CSH.

About a month after Ex. P-24 was faxed to Evergreen's
insurance company, Banner Bank commenced its litigation against the
defendants. At that point the Enomoto accounts were transferred to
Bruce Nelson the Senior Vice President and Manager of Special
Credits. On May 23, 2003, the Federal Deposit Insurance
Corporation issued an Order of Prohibition From Further
Participation (FDIC-03-007e) with regard to Mr. O'Flaherty, finding
that he had engaged in "violations, unsafe or unsound banking
practices, and/or breaches of fiduciary duty" with respect to
Banner Bank and that he would be prohibited from, *inter alia*,
"participating in any manner in the conduct of the affairs of any
financial institution or organization enumerated in section
8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A)." Ex. D-3.
Neither Mr. O'Flaherty nor Ms. Thomas testified at trial.

### III. ISSUES

The issues in the case are (i) whether Banner Bank is entitled
to judgment for amounts due under the various notes and guaranties
described above and, if so, for what amount; and (ii) whether the

---

[12] The letter implies wrongdoing by a long list of former
Evergreen employees over a prolonged period.

Memorandum Decision - 27

defendants are entitled to offset any amount due or are entitled to affirmative relief against Banner Bank.

## IV. DISCUSSION

A.   Forgery.

Based upon the testimony of Dr. and Mrs. Enomoto, the only uncontested signatures are as follows:

- Mrs. Enomoto admits signing the Evergreen Guaranty and the O Loan Note, but she denies she signed any of the other loan documents at issue. She claims that either her signature on these other documents is a forgery or that she signed only a signature page that was fraudulently attached to another document.

- Dr. Enomoto admits that he signed the M Loan documents, including the M Loan Note, the security agreement and the Evergreen Guaranty. He either did not recall signing the rest of the documents bearing his name or he claims that he signed a signature page that was fraudulently attached to another document.

For illustrative purposes, Mrs. Enomoto created a chart that was admitted as Ex. D-148A. The chart shows the progression of each loan through a series of loan documents. Mrs. Enomoto admits signing only the documents that are depicted in green boxes with solid green borders. According to the chart, Mrs. Enomoto admits that she signed the original note that created the $600,000 loan to Century Inc. and Century Ltd. in 1996, but after that point she never signed another loan document related to that loan. Mrs. Enomoto denies that any authentic signature appears on any document related to the J Loan, the K Loan, the L Loan and the N Loan.[13]

---

[13]   Dr. and Mrs. Enomoto claim that the M Loan, the O Loan and the P Loan were each procured through fraud on the bank's part through its agent Rory O'Flaherty.  *See* Section IV.C *infra*.

Memorandum Decision - 28

Under Washington law, the relevant provision governing forged signatures, or validity of signatures in the statute's terminology, is RCW 62A.3-308(a) which provides:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, *the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized*....

(Emphasis added).[14] Because of the presumption, the plaintiff is only required to meet its burden after the defendant has introduced some evidence "which would support a finding that the signature is forged or unauthorized." RCW 62A.3-308(a) Official Comment 1.

There is no Washington case law indicating how much evidence is sufficient to rebut the presumption of authenticity. The official comments to the statute, however, provide that "[t]he defendant's evidence need not be sufficient to require a directed verdict, but it must be enough to support the denial by permitting a finding in the defendant's favor." RCW 62A.3-308(a) Official Comment 1.

Courts in other jurisdictions differ as to what evidence is sufficient to rebut the presumption. For example, in *First Nat. Bank in Marlinton v. Blackhurst*, 345 S.E. 2d 567, 572 (W.Va. 1986)(language of local UCC provision similar to RCW 62A.3-308(a)), the court ruled that "a mere denial of the signature's genuineness [was] insufficient," but "a denial along with a sample of [the]

---

[14] RCW 62A.1-201(43) defines "unauthorized" signature as "one made without actual, implied or apparent authority and includes a forgery."

Memorandum Decision - 29

true signature" was sufficient to rebut the presumption.  In contrast, in *Triffin v. Somerset Valley Bank*, 777 A.2d 993, 1001 (N.J. Super. A.D. 2001)(language of local UCC provision similar to RCW 62A.3-308(a)), the court ruled that it was insufficient to rely on "self-interested and conclusory statements" to "disprove the authenticity of the signature."

Neither party in this case called a handwriting expert. Therefore, the Court must make findings of fact on the authenticity of the signatures at issue without the benefit of expert testimony. The bank relies on the fact that the loan documents were produced from its ordinary business records.  Dr. and Mrs. Enomoto supplied only their own testimony denying their signatures or claiming that they did not intend for pages they signed to be attached to particular loan documents.  This Court concludes that the Enomotos did not meet their burden of overcoming the presumption of validity solely by their "self-interested and conclusory statements."

The testimony of Dr. and Mrs. Enomoto lacked credibility. They admit they signed notes that initiated certain of the loans (e.g., the H Loan and the P Loan, *see* Ex. D-148A), but they have no explanation as to why they were never called to pay off these loans until Mr. Goddu's demand letter in September of 2001.  They admit they understood that the loans were "rolling," but they deny they signed any of the loan documents that would have been required to make that happen as a matter of contract law.  Dr. and Mrs. Enomoto

Memorandum Decision - 30

ask the Court to find that Mr. O'Flaherty forged all of these documents.[15]

Mrs. Enomoto was asked to sign Ex. D-151 in the courtroom. She then testified about the distinctive features of her signature: the "tails" on the first prong of the initial "H" in her first name; the curved, rather than straight "E" in Leah; the fact that she always included "Mahon" and "Enomoto" whenever she signed her name; and the fact that when signing in a corporate capacity, she always indicated her official corporate title. In the face of this testimony, however, is Ex. P-7-O (the O Loan Note), which Mrs. Enomoto admits she signed. There are no "tails" on the initial "H"; the "E" in "Leah" is flat, not curved; and "Enomoto" is missing completely. Similarly, the Marine View Deed of Trust, which Mrs. Enomoto claimed was a forgery, is notarized - the signature on the document does not show the "tail" on the initial "H" nor does the name "Enomoto" appear. Mrs. Enomoto's claim that the signature on this deed of trust must be forged merely because the notary referenced was not their "usual" notary is not believable.

During her testimony in court, Mrs. Enomoto was not always able to accurately identify her signature. At one point during her

---

[15] It is true that in the RSM report, Ms. Howe found an instance of an apparently forged signature on another bank customer's executive line of credit. *See* Ex. D-111, p. ¶ 3. RSM also found on Mr. O'Flaherty's computer two tax returns he apparently fabricated for the Enomotos. These tax returns are not in evidence, however, so the Court is unable to determine whether he forged the Enomotos' signatures on the returns. Ms. Howe testified that the tax returns had been filled in, but she could not recall if they had been signed. There is, therefore, no direct evidence that Mr. O'Flaherty ever forged a document alleged to be signed by the Enomotos.

Memorandum Decision - 31

cross examination, she was shown a number of single pages on which appeared only her "alleged" signature. She was asked to testify which of the pages bore her authentic signature. Subsequently, the bank produced and the Court admitted into evidence as Ex. P-56 each of the documents from which the signatures were obtained. In all, there were six pages showing her signature. Mrs. Enomoto testified that Ex. P-56A and Ex. P-56B bore her signature, but that Exhibits P-56C, P-56D, P-56E, and P-56F were forgeries. Exhibit 56C is a declaration under penalty of perjury bearing Mrs. Enomoto's signature which was submitted to the Superior Court. Mrs. Enomoto testified that the signature on Ex. P-56C was not hers because, at the time it was signed, she was in the hospital awaiting surgery. She testified she asked a nurse to sign this declaration for her because she was unable to sign it. The signature clearly does not resemble Mrs. Enomoto's and there is no indication that someone else has signed this for her. Mrs. Enomoto submitted the declaration under penalty of perjury to a court of law without any indication that she had not signed the document herself. Exhibit P-56D is a Promissory Note for CSH in the principal amount of $328,844.48. Mrs. Enomoto shows on Ex. D-148A that page two of the note does not follow content-wise with page one. She is correct about that: the last line of page one does not accurately complete on page two. Exhibits P-56E and P-56F are defendants' answers to discovery requests, submitted by counsel for the defendants to the plaintiffs, showing Mrs. Enomoto's notarized signature. In fairness to Mrs. Enomoto, the pages she was shown make the signatures look fatter as a result of the copying process. More

Memorandum Decision - 32

importantly, however, in both Exhibits P-56E and P-56F there is no tail on the initial "H" and the "E"s are all flat and not curved.

Dr. Enomoto never denied signing any document that bears his name. Instead, he testified that he either did not recall signing the document (*e.g.*, the 8/20/96 Guaranty), he "probably" signed the document (*e.g.,* the N Loan Note), or he signed a signature page only (*e.g.,* the P Loan Agreement).

As the trier-of-fact, this Court has examined each of the documents referenced in Section II.D*, supra*, and cannot conclude that the signatures of the Enomotos, which appear on those documents, are forgeries. The Court also rejects the Enomotos' claim that they signed signature pages that were somehow fraudulently attached to loan documents they did not intend to sign. The signature pages attached to each of the loan documents described in Section II.D., upon which the bank seeks to collect, follow correctly from the preceding page - thus, they appear to be the correct pages for the various documents. The Court concludes that the pages were correctly attached and that the Enomotos did not pay close attention to the documents before they signed them.

The Enomotos admit that they signed signature pages in blank. Each promissory note upon which the bank seeks to collect states, just above the signature line:

> PRIOR TO SIGNING THIS NOTE, I, AND EACH OF US, READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. I, AND EACH OF US, AGREE TO THE TERMS OF THE NOTE.

Memorandum Decision - 33

(Capitalization in original).[16]  In the case of the guaranties,

language in the same position above the signature line reads:

> EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING
> READ ALL THE PROVISIONS OF THIS GUARANTY AND
> AGREES TO ITS TERMS.

(Capitalization in original).[17]  The Enomotos apparently disregarded

this language and abdicated their duty to make sure they were

affixing their signatures to documents they intended to be legally

enforceable against them.  By failing to keep copies of the

documents, the Enomotos may not now deny that they did not intend

to sign the documents the bank seeks to enforce against them.

     For the foregoing reasons, this Court concludes that each of

the loan documents referenced in Section II.D of this Memorandum

was validly executed and authorized by the signatory thereto.

B.   Unauthorized Transfers.

     The defendants challenge three types of unauthorized transfers

from and between their accounts: (i) transfers of funds between

their entities; (ii) specified transfers out of the checking

accounts of the Enomoto Entities; and (iii) transfers of funds from

their checking accounts by way of cashier's checks.

---

[16]   The Court notes that Ex. P-8-O, the P Loan Agreement, has
Dr. Enomoto's signature line on page 4 by itself.  Dr. Enomoto
admitted that he signed this signature page.  The last paragraph on
page 3 of the agreement states: "By signing this Agreement, you
[borrower] acknowledge that you have read this Agreement.  You also
acknowledge receipt of a completed copy of this Agreement,
including the Fair Credit Billing Notice."

[17]   The Court notes that the Enomotos submitted a number of
declarations of friends or business associates who attested to
their good character.  The Court gave these declarations little
weight, as none of these individuals testified at trial and the
Court regards the testimony of the Enomotos and the other evidence
presented at trial to be better indicators of their credibility.

Memorandum Decision - 34

1      1.   <u>Intercompany Transfers</u>.

The defendants challenge each intercompany transfer of funds between their loan and checking accounts as unauthorized transfers. They claim these unauthorized intercompany transfers total $2,194,431.27 from the inception of the Banner Bank lending relationship (August 26, 1996 through August 16, 2001). Exhibit D-161 breaks these transfers down by entity. The bank's expert, Robert Wagner, and the defendants' expert, Harvey Forman, traced each of the intercompany transfers. Mr. Wagner is an outside consultant and Mr. Forman is currently employed by Evergreen as its office manager.

Mr. Wagner, the bank's expert witness, was engaged by the bank to examine each of the loans at issue, to track the principal balance of each, and to confirm that the Enomoto Entites received all of the loan proceeds. Mr. Wagner produced Exhibit P-25, a three-ring binder with his detailed analysis of each loan. He testified extensively about the work papers contained in Exhibit P-25. In addition, the bank asked Mr. Wagner to investigate each and every transaction or transfer challenged by Mr. Forman in a declaration he filed in state court.[18] Mr. Wagner's analysis of these disputed transactions is contained in Exhibits P-26, P-27 and P-28, each of which is a three-ring binder.

There is no dispute between Mr. Wagner and Mr. Forman that, of the $2,194,431.27 in challenged intercompany transfers, only $12,500 was transferred outside of the Enomoto Entities. Mr. Nelson testified that in calculating the total amount owed by

---

[18] Mr. Forman's declaration is Ex. P-16, which lists 94 transactions challenged by the defendants.

Memorandum Decision - 35

the defendants, the $12,500 which was transferred out of the P Loan proceeds on August 18, 2000 to an unrelated third party, was credited back to the P Loan account effective August 18, 2000, thereby negating any interest charges on that amount. Therefore, the bank contends the defendants have not been damaged in any way by the admittedly improper transfer. The defendants claim that all of the other transfers, totaling $2,181,931.27, were not authorized intercompany transfers and the Court should therefore reduce the bank's claim by this amount. For the following reasons, the Court rejects this claim by the defendants.

a. <u>Authorization</u>.

Neither party produced any evidence of who initiated the transfers the defendants challenge. There were no checks or other written documents produced which initiated or authorized the transfers. Each transfer appears to have been made electronically. The Enomotos claim, without any evidentiary support, that Mr. O'Flaherty initiated all of these transfers. The bank did not specifically deny that the transfers were made by Mr. O'Flaherty, nor did it produce any evidence that the transfers were initiated by the Enomotos or someone with authority to act on their behalf. Relying on Exhibit P-22A, the bank argued that the transfers were authorized by Ms. Thomas. Exhibit P-22A is a handwritten note purporting to bear the signature of Mrs. Enomoto and which reads in its entirety:

> I authorize Jan Thomas our corporate business manager to manage, transfer, cash withdrawal, pull

Memorandum Decision - 36

any and all records to conduct business on any and all accounts of Banner Bank.[19]

Mrs. Enomoto claims she did not write Ex. P-22A and that it is a complete forgery. She claims to have been in Arizona on December 20, 2000 when Ex. P-22A was allegedly written.

There is nothing in Article 3 or 4 of RCW 62A that requires the authorization for an account transfer to be in writing. RCW 62A.4-401(a) provides that

> (a) A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is *authorized by the customer and is in accordance with any agreement between the customer and bank.*

(Emphasis added). The term "item" is not defined, but presumably it includes a transfer of the type at issue. Further, RCW 62A.3-403 provides that even an unauthorized signature can be ratified. Arguably, assuming its validity, Ex. P-22A could be read broadly to authorize Jan Thomas to make phone transfers between the Enomoto accounts. The problem with the bank's reliance on Exhibit P-22A, however, is that there is no evidence that Jan Thomas did request, authorize, or in any way initiate any of the challenged transfers. Also, Ex. P-22A, which is dated December 22, 2000, could not be relied upon for transfers prior to that date.

Although both Dr. and Mrs. Enomoto denied having personally authorized any of the transfers, Dr. Enomoto admitted that he not only knew about the transfers but that he was expecting Mr. O'Flaherty to make these kind of transfers. Dr. Enomoto

---

[19] Importantly, Jan Thomas did not sign Ex. P-22A, so it would not provide the bank with an example of her signature.

Memorandum Decision - 37

testified that Mr. O'Flaherty took it upon himself to make the transfers that he thought were necessary. Dr. Enomoto never testified, nor is there any evidence, that he ever objected to Mr. O'Flaherty's intercompany transfers. Dr. Enomoto specifically acknowledged that Mr. O'Flaherty would move money around to cover overdrafts. He also testified that if the clinic needed money, his wife's company might make a loan to the clinic and that Evergreen would pay the Enomotos' personal expenses. Dr. Enomoto also testified that although he knew Mr. O'Flaherty was moving money between accounts, he assumed this meant between accounts *of the same entity.*

Mrs. Enomoto claimed that the signature cards signed at the outset of the banking relationship, which are Ex. D-31, did not permit these transfers. The signature cards included in Ex. D-31 provide that withdrawals can be made via one signature and all but one of the cards indicates that facsimile signatures are not allowed. The cards also indicate, however, that the owners of each account received an electronic funds transfer disclosure and agreed to the terms of the disclosures. The disclosures and page two of the signature card form are not in evidence so the Court cannot determine what the Enomotos authorized by way of electronic transfers, such as those at issue here.

            b.  Disclosure of Intercompany Transfers.

Mr. Wagner's loan-by-loan analysis in Exhibit P-25 shows that each and every intercompany transfer challenged by the defendants appeared either on one of their loan statements or one of their checking account statements. Despite that, during the five-year period in which these transfers occurred, not once did any of the

Memorandum Decision - 38

affected entities challenge any of the transfers. Instead, Mrs.
Enomoto claims that she and Dr. Enomoto and their companies never
received any bank account or loan account statements. She
testified repeatedly that she and other employees continually
requested these statements from Mr. O'Flaherty over this five-year
period, but never received the requested statements. Dr. Enomoto
testified that he believed they were not receiving statements, but
he clearly had no first-hand knowledge of this and did not testify
that he ever asked Mr. O'Flaherty himself for any statements.

Given the significant number of intercompany transfers which
have been challenged, one would have to believe that the Enomoto
Entities never received a single bank account or loan statement
during the five-year period at issue. In this Court's view,
Mrs. Enomoto's testimony is not credible. Mrs. Enomoto admitted
that she personally did not routinely review bank statements and
that she left this to employees. Instead, she reviewed only
summaries of statements prepared by her "team" of financial
assistants. One would assume that the statements would have had to
have been in the hands of those employees in order for them to
prepare the summaries. Further, despite the fact that Mrs. Enomoto
claims to have repeatedly requested Mr. O'Flaherty to send her
account and loan statements, there is no written evidence of any
such request from 1996 to 2001.

Mrs. Enomoto's testimony is also contradicted by Judy Silver's
letter. *See* Ex. P-32. In the August 20, 2001 letter, which Mrs.
Enomoto did not deny seeing at the time it was written, Ms. Silver
indicates that it was the internal record-keeping of Century Inc.,
Century Ltd. and CSH which created the accounting problems.

Memorandum Decision - 39

Ms. Silver's letter does not suggest that she needs anything from the bank by way of bank or loan account statements or information from the bank concerning intercompany or shareholder loans. When Mrs. Enomoto was questioned about Ex. P-32, she testified that information was needed from the bank to reconcile the transfers between the entities. She clearly knew about the transfers, therefore, and there is no evidence Mrs. Enomoto ever complained about the transfers to the bank at any time before the litigation was filed.

The checking account statements for the Enomoto Entities are in evidence as Ex. D-165. Dr. and Mrs. Enomoto confirmed that the addresses on the statements contained in that exhibit for each of the Enomoto Entities was correct. Similarly, the loan account statements showing the transfers are in evidence in various places in Mr. Wagner's reports and the addresses for the Enomoto Entities are the same. The bank presented testimony that checking and loan account statements are sent monthly to its customers. The Enomotos claim that Mr. O'Flaherty *could have* prevented the bank's regular practice of sending these statements, but there is no evidence that Mr. O'Flaherty ever took such action or ordered a subordinate to do so. The defendants did not call any other employee responsible for the financial information at the various Enomoto Entities to corroborate their claim that they never received any statements from the bank. Instead, Mrs. Enomoto detailed in her testimony how every employee who was responsible for the financial aspects of the Enomoto Entities was dismissed for fraud, embezzlement or some form of impropriety. The list of terminated employees is lengthy. *See* Ex. P-23, P-24 (as to Evergreen Employees).

Memorandum Decision - 40

1   The Court finds the testimony of Dr. and Mrs. Enomoto that
2   they never received any account or loan statements not credible.
3   The Court finds instead that the statements were sent to the
4   Enomoto Entities in the ordinary course of the bank's business and
5   that the Enomotos are charged with knowledge of what the statements
6   would have disclosed.

7       RCW 62A.4-406 deals with the rights and obligations of banks
8   and their customers with respect to bank statements.  Subsection
9   (c) provides:

> If a bank sends or makes available a statement
> of account or items pursuant to subsection (a),
> the customer must exercise reasonable
> promptness in examining the statement or the
> items to determine whether any payment was not
> authorized because of an alteration of an item
> or because of a purported signature by or on
> behalf of the customer was not authorized.  If,
> based on the statement or items provided, the
> customer should reasonably have discovered the
> unauthorized payment, the customer must
> promptly notify the bank of the relevant facts.

In addition, subsection (f) of RCW 62A.4-406 sets deadlines for
customers to discover and report any unauthorized signature or any
alteration on the face or back of an item.  Subsection (a) of RCW
62A.4-406 requires the bank to provide information in the statement
that is "sufficient to allow the customer reasonably to identify
the items paid."

    Although the intercompany transfers which are at issue here do
not fit neatly into the preceding statutory provisions which refer
to unauthorized signatures or alterations (because there is no
writing alleged to be unauthorized or altered), the intent of
RCW 62A-406 is applicable here.  A bank has an obligation to
provide its customer with information that is sufficient to permit

Memorandum Decision - 41

the customer to identify the items and transfers that have been made, and a bank customer has a corresponding obligation to promptly review the information provided by the bank and notify the bank of any transactions the customer did not authorize or any mistake the customer believes the bank has made.

In this case, Banner Bank provided regular monthly statements to the Enomoto Entities showing their loan and checking account transactions. It is undisputed that between August 26, 1996 and August 16, 2001, none of the Enomoto Entities made any written objection to any transaction shown on any of their checking account or loan account statements. The defendants contend that the information provided to them in the statements was not adequate to enable them to sufficiently identify the transactions and that the bank "intentionally covered up this information to avoid discovery by the customer of the Bank's consistent plan during at least 1999-2001 (three years) of making unauthorized disbursements from the loan accounts." *See* Non-Debtor Defendants' Post-Trial Brief of Law Summary of Evidence ("Defendants' Post-Trial Brief"), p. 4.

An analysis of the defendants' contention is best conducted using various examples. The first intercompany transfer challenged by the defendants is a $50,000 loan advance made on August 26, 1996. *See* Ex. D-161, p. 1 (of 4). The sum was advanced pursuant to the terms of a promissory note dated as of August 20, 1996 in the principal amount of $600,000 under Loan No. 0169013075. Ex. D-84. Both Century Inc. and Century Ltd. were obligors under the H Loan, which is shown in the green box on Mrs. Enomoto's diagram in Ex. D-148A. The Disbursement Authorization dated August 20, 1996 which accompanied the note (Ex. D-84), indicates that the purpose

Memorandum Decision - 42

of the loan was for construction and development, which is consistent with Mrs. Enomoto's testimony.  Mr. Wagner tracked the advances made under this loan in Ex. P-25, Tab 1.  The $50,000 advance at issue is shown on page 201 in the exhibit.  Mr. Wagner's exhibit also shows that the advance was deposited into the account of Century Ltd., an obligor under the note.  The advance is shown as a credit on Century Ltd.'s bank statement showing transactions between August 23, 1996 through August 30, 1996 (*See* p. 00509 of Ex. P-25, Tab 1).  The loan account number for the H Loan, 0169013075, is referenced in the statement.  The statement shows another credit to the account of $10,000, referenced as a "Loan Advance" without any reference to a loan number.  Mr. Wagner's Tab 1 in Ex. P-25 shows the advance was also made under the H Loan. Finally, the bank statement shows that $50,000 in the account was transferred to "Another Account" with no reference to an account number.  Although the latter two transfers do not refer to a specific loan or account number, this Court concludes that the statement discloses sufficient information to enable the account holder to determine more specific information from its records, including the statements of related entities, or to suggest that the account holder seek additional information from the bank.

The Court also finds that, at least as to the intercompany transfers between Century Inc., Century Ltd. and CSH, the defendants are precluded from avoiding those transfers because of their failure to keep their corporate operations separate.  Century Inc, Century Ltd. and CSH all shared the same office space, worked on the same project(s), shared the same officer and shareholder (Mrs. Enomoto), and shared the same employees.  CSH never had an

Memorandum Decision - 43

ongoing business operation, Century Ltd. was merely a real estate holding company, and Century Inc. had only limited operations. Given that Mrs. Enomoto treated these entities as one, the Court finds nothing improper about the intercompany transfers between them regardless of who orchestrated those transfers.

As to transfers in and out of Evergreen, the Court is bound by the Summary Judgment in the state court action which set the amount of the bank's claim under the M Loan and confirmed the bank's security interest in the Collateral to secure that loan. Evergreen had an opportunity to argue in state court that the balance of the M Loan should be reduced on account of the intercompany transfers but the state court rejected that argument. Moreover, out of the $108,000 in transfers out of Evergreen (Ex. D-161, p. 3), $65,000 went into the joint account of Dr. and Mrs. Enomoto. This would be consistent with their testimony that they routinely used funds of Evergreen to pay their own personal expenses. Of the remaining transfers, $5,000 was transferred to CSH, $2,500 to Century Inc., and $35,000 to Century Ltd. Exhibit D-161 also shows that Evergreen was the recipient of transfers totaling $112,000 from CSH, Century Inc. or Century Ltd., plus a $3,000 transfer from the O Loan, under which Mrs. Enomoto was obligated. Thus, Evergreen actually received slightly more money from related entities than it paid out.

The evidence shows that the intercompany transactions at issue were anticipated by the Enomotos and were sufficiently disclosed on statements from the bank without any objection by the Enomotos for a period of years. Thus, the Court finds that the Enomoto Entities

Memorandum Decision - 44

1  ratified these intercompany transfers under RCW 62A.3-403 by

2  failing to timely object to them.[20]

3      2.   <u>Unauthorized Transfers from Checking and Loan Accounts</u>.

4      The defendants also challenge many transfers identified by Mr.

5  Forman in a Declaration dated November 10, 2003 which was filed in

6  the state court action and which is Ex. P-16 (the "Forman

7  Declaration").[21]  Mr. Wagner attempted to trace each of the

8  challenged transfers and his work papers are contained in Exhibits

9  P-25, P-26, P-27, and P-28.  Mr. Wagner summarized his calculations

10 in Exhibit P-31, which exhibit notes that he was unable to trace

11 $89,262.96 of the transfers of funds identified in Mr. Forman's

12 Declaration.  The Court will deal separately with each group of

13 transfers in the order set forth in the Forman Declaration.

14      a.   <u>Evergreen Checking Account 169022803</u>.

15     The Forman Declaration identifies $47,165.31 in alleged

16 unauthorized transfers from Evergreen checking account number

17 870000733.  Mr. Wagner traced those transfers in Ex. P-26, Tab A.

18

---

19     [20]  The Court notes that even if the transfers were not
20 authorized, the Enomoto Entities would not be entitled to a
   recrediting of their accounts if the bank's action caused them no
21 loss.  *Gatoil (U.S.A.), Inc. v. Forest Hill State Bank*, 1 UCC
   Rep.Serv.2d 171, (1986); *see also* RCW 62A.4-406(e).  In this case,
22 the defendants have failed to show how any of the defendants were
   harmed by these intercompany transfers.  As a group they received
23 all of the money that was transferred except for $12,500, which the
   bank recredited back.

24     [21]  In their brief, the defendants also referred to
25 unauthorized deductions allegedly made from their checking accounts
   totaling $393,285.15.  Mr. Adler referred to these transfers in his
26 closing argument; yet, the Court can find no reference to how this
   number was calculated in any of the oral testimony or written
27 evidence.  In his direct testimony, Mr. Forman did not refer to
   this number.  Because there is no evidence in support of this
28 claim, the Court finds that the defendants are not entitled to a
   setoff or deduction for $393,285.15.

Memorandum Decision - 45

The largest transfer in this group, in the amount of $26,773.04, was a cashier's check issued on May 8, 1998 payable to the Internal Revenue Service. Evergreen does not deny that the check was paid to the Internal Revenue Service and the check is not listed in the binder of disputed cashier's checks, Ex. D-54. Accordingly, the Court concludes that Banner Bank has accounted for each of the transfers in this category.

        b.   <u>Century Ltd. Account No. 167008416</u>.

Mr. Forman's Declaration identifies $108,247.36 in unauthorized transfers from Account No. 167008416 of Century Ltd. Mr. Wagner tracked the transfers in Ex. P-26, Tab B. There are two unnumbered checks in this group, both of which appeared on the bank statement sent to Century Ltd. If there were concerns about the checks, Mrs. Enomoto's financial team could have questioned the bank. There are also two cashier's checks in this group of transfers, but the checks are not included in Ex. D-54. Therefore, the Court concludes the bank has adequately traced the transfers in this category.

        c.   <u>Enomoto Account No. 87500500</u>.

The defendants challenge $13,100 in alleged unauthorized transfers from the Enomotos' joint personal account. Mr. Wagner traced three of the four transfers in Ex. 26, Tab C. He admitted he could not trace a $1,000 transfer; thus, the Enomotos are entitled to a recrediting of that amount. The balance of the transfers were traced to telephone transfers.

Memorandum Decision - 46

### d.   H Loan Account No. 169013075.

The Foreman Declaration identifies $356,068.54 in unauthorized transfers from the H Loan account.[22]  Mr. Wagner traced these transfers in Ex. P-25, Tab 1A.  The one transfer that stands out in the group of 15 transfers noted is a $200,000 transfer on February 16, 1999.  According to Mr. Wagner's accounting (Ex. P-25, Tab 1A, p. 00203) a payment was made on the H Loan by way of a transfer from loan account number 16922803 (*Id.* p. 00131).  The payment reduced the H Loan balance from $775,000 to $575,000.  On February 26, 1999, a loan advance of $200,000 was charged to the H Loan effective as of February 15, 1999, increasing the H Loan balance to $775,000.

No distribution of $200,000 was made to any of the Enomoto entities and the Court can find no reference to this transfer in any loan or bank statement in evidence.  It appears that this was a transfer orchestrated by Mr. O'Flaherty to make the loan balance look lower on February 16, 1999 than it actually was.  The Court can find no promissory note associated with loan account number 16922803, consistent with Mr. Forman's statement in his Declaration on page two that the loan was unknown to the Enomotos.  Mr. Wagner confirmed in his testimony that he could not locate a note associated with this account and he agreed that this appeared to have been an internal entry only.  Although the transaction appears to be improper, it does not appear that the Enomoto entities were damaged in any way by it.  Accordingly, the Court concludes that

---

[22]  The total of these transfers should actually be less because a $500 transfer on July 1, 1997 is shown incorrectly in the Forman Declaration as a $5,000 transfer.

Memorandum Decision - 47

1   the defendants are not entitled to any reduction in their

2   obligation to the bank on account of any transactions in this

3   category.

4           e.   Mrs. Enomoto Account No. 81500688.

5       Mr. Forman has identified six transfers totaling $14,000 from

6   Mrs. Enomoto's checking account that he claims were unauthorized.

7   Mr. Wagner traced these transfers in Ex. P-26, Tab D.  He was able

8   to track each transfer except for a $1,000 transfer on February 28,

9   2000.  Other than the $1,000 transfer, for which Mrs. Enomoto is

10  entitled to a recredit to her account, the Court is satisfied that

11  the bank has accounted for the other transfers.

12          f.   Century Inc. Account No. 167016195.

13      Mr. Forman identified three transfers totaling $85,396.65 from

14  Century Inc.'s checking account which he contends were

15  unauthorized.  Mr. Wagner traced two of the transfers in Ex. P-26,

16  Tab E.  Mr. Wagner admitted that he could not track the $35,038

17  transfer made on October 20, 2000.  The bank statement states that

18  $35,038 was transferred "to another account."  *Id*. at p. 001674.

19  The other two transfers represent deductions for one or more

20  cashier's checks which the Court has dealt with in Section B.3

21  below.  Based upon the bank's inability to account for the $35,035

22  transfer on October 20, 2000, the Court will order this amount to

23  be recredited to Century Inc.

24

25

26

27

28

Memorandum Decision - 48

1          g.  CSH Account No. 87004453.[23]

2       The Forman Declaration lists numerous transfers from the CSH

3  checking account, most of which are attributable to the issuance of

4  cashier's checks.  Mr. Wagner's accounting of the transfers in this

5  category is at Ex. P-28, Tab F.  Mr. Wagner could not trace a

6  February 7, 2001 transfer of $21,376; therefore, CSH is entitled to

7  a credit for this amount.

8       Two other transfers shown in this category are worthy of

9  mention.  The first is a transfer of $675,229.80 on August 18,

10 2000.  That transfer appears on the bank account statement for the

11 period ending August 31, 2000.  Ex. P-25, Tab 7, p. 00152.

12 Mr. Wagner provided a lengthy explanation for the various transfers

13 shown on this statement.  The statement shows a $480,000 loan

14 advance from the O Loan as well as an additional deposit in the

15 amount of $337,614.90.  Mr. Wagner testified that the $337,614.90

16 deposit was actually a mistake which was corrected on the debit

17 side of the account statement by a withdrawal of $675,229.80.  The

18 net effect of the transfers was that $50,000 from the O Loan

19 proceeds was transferred to the H Loan on August 14, 2000,

20 $86,128.09 was transferred to the K Loan on August 17, 2000, and

21 the remaining amount of $337,614.90 was transferred to the H Loan

22 on August 18, 2000.  The $337,614.90 transfer is shown as a

23 deduction to the H Loan balance by two payments, one in the amount

24 of $102,389.90 and one in the amount of $235,225.  Ex. P-25, Tab

25 1A, p. 00203.  Thus, although the bank statement is very confusing,

26

27       [23]  The Forman Declaration incorrectly refers to this account
   as an account of Century Inc.  According to the statements in Ex.
28 P-28, Tab F, this account actually belongs to CSH.

Memorandum Decision - 49

Mr. Wagner has provided an explanation of the numbers shown on it, which explanation the Enomotos could have obtained from the bank had they inquired.

The other transfer about which there was considerable testimony at trial was a $60,000 transfer made on May 25, 2001. This amount was deducted from the CSH account and transferred into the account of another customer of the bank, completely unrelated to any of the Enomoto entities. The unrelated customer spent the money and the bank did not discover the error until December of 2001. Banner Bank contends that CSH did not suffer any damage as a result of this transfer because once the bank discovered the error, the overdraft fee which had been charged CSH on account of the transfer was reversed and the $65,000 overdraft balance remaining in the account when the litigation was commenced was written off by the bank. The Court does not agree with this analysis.

The bank account statement for CSH for the period ending May 31, 2001 shows the $60,000 transfer. Despite the wrongful transfer, CSH still had a positive bank balance at the end of the month in the amount of $51,295.24. Ex. 165, p. BBE08310. As of June 29, 2001 and July 31, 2001, CSH still had a positive bank balance even though the $60,000 transfer had not yet been reversed. *Id*. It was not until the end of August that CSH was overdrawn by about $43,000. The statement reflects that on August 14, 2001 an advance of $60,000 was made from the N Loan and deposited into this account. This might not have been necessary had the account already been recredited with the $60,000 transfer. By October 2001, CSH was overdrawn by $65,843.04, including check handling

Memorandum Decision - 50

fees and overdraft interest charges. The recrediting of the
account in December of 2001 was meaningless to CSH by that time.

The Court concludes that the bank should be required to refund
the wrongful $60,000 under the facts of this case. Although the
transfer was disclosed on the CSH statement, the Court is not
inclined to put the burden on CSH to have discovered this
particular transfer. There is no evidence this $60,000 transfer
was initiated in any way by the Enomoto entities and the bank is
charged with the knowledge that the transfer was unauthorized. In
addition, the Court will award CSH a setoff against its obligations
in the amount of all check handling and overdraft interest charges
on this CSH bank account on or after May 25, 2001. Finally, the
Court will require that interest charges on the N Loan advance of
$60,000 made on August 14, 2001 be deducted from the balance owing
on the N Loan.

h.    Mrs. Enomoto Account No. 169029287.

Mr. Forman challenged as unauthorized a loan advance in the
amount of $242,588.59 made on August 13, 2001 from the N Loan.
Mr. Wagner traced these loan proceeds in Ex. P-25, Tab 6, p. 00184.
Mr. Wagner testified that this transaction was similar to the
$200,000 transfer described in subsection (d) *supra*. The transfer
was made only on the bank's internal books. It appeared to have
been initiated by Mr. O'Flaherty and then reversed later with an
effective date of August 13, 2001. Using this transfer
Mr. O'Flaherty was able to make the loan balance appear to be zero
for the bank's internal purposes. No amount was ever charged to
the loan or transferred out of the account of the Enomotos. In
this instance, according to Mr. Wagner, Mr. O'Flaherty used a

Memorandum Decision - 51

suspense account to hold the $200,000 transfer from August 3, 2001 to August 10, 2001 when Mr. O'Flaherty reversed the transfer.

While the Court agrees that this transfer is clearly improper, it had no impact on the Enomotos or their entities. If any entity was harmed by this transfer, it was Banner Bank.

### i. Century Inc. Account No. 169030947.

The Forman Declaration challenges a $599,934.10 loan advance made under the J Loan on May 13, 2001. Mr. Wagner tracked this transfer in Ex. P-25, Tab 2. This transfer is another internal Banner Bank transfer orchestrated by Mr. O'Flaherty. On August 3, 2001, the loan account balance was reduced to zero by a payment from a nonexistent loan account. Then, the payment was reversed on August 17, 2001 with an effective date of August 3, 2001. Thus, there was no impact on Century Inc., no interest charged on the account and no transfer of any funds belonging to Century Inc. Consequently, the Court finds that the defendants were not damaged on account of this internal bank transfer.

### j. CSH Account No. 169033057.

The Forman Declaration identifies a $474,930.95 transfer made under the L Loan. The transfer actually occurred on August 13, 2001, not May 13, 2001 as stated in Mr. Forman's Declaration. Mr. Wagner's work papers in Ex. P-25, Tab 4 confirm that this transfer is another of Mr. O'Flaherty's internal bank transfers to make the L Loan balance look like it had a zero balance as of August 3, 2001. For the same reasons articulated in the preceding paragraphs, the Court will not award any damages to the defendants on account of this transaction.

Memorandum Decision - 52

1          k.  Enomotos Account No. 161505904.

2     Mr. Forman identifies two transactions totaling $128,302.79

3  that are claimed to be unauthorized transfers from the joint

4  account of Dr. and Mrs. Enomoto.  Of this amount, Mr. Wagner was

5  able to account for all but $10,302.79 of the funds.  *See* Ex. P-28,

6  Tab G.  Accordingly, the Court will award $10,302.79 in damages

7  against Banner Bank.[24]

8     3.  Cashier's Checks.

9     The defendants claim that the bank issued cashier's checks

10 totaling $739,583.72[25] drawn on the accounts of the Enomoto Entities

11 without proper authorization.  Mr. Forman prepared a binder showing

12 all of the challenged cashier's checks, which binder was admitted

13 into evidence as Ex. D-54.  The checks are broken down by entity as

14 follows:

15 Checks on CSH account:          3/21/00-9/25/01 =   $593,772.71
   Checks on Century Inc. account: 10/3/00-5/31/01 =  $ 78,779.02
16 Checks on Mrs. Enomoto account: 8/28/00-6/6/01 =   $ 67,031.99
   Total                                              $739,583.72
17
18 At the beginning of each section of Ex. D-54, Mr. Forman has

19 prepared a list of each check, the date the check was issued, and

20 the name of the payee.  Copies of the cashier's checks, the debit

21

22     [24]  Mr. Forman concludes his Declaration by identifying two
23 documents, a November 10, 2000 Change in Terms Agreement and an
   undated Commercial Guaranty that he opines are forgeries.  The
24 Court did not qualify Mr. Forman as a handwriting expert and
   therefore rejects any opinion he offers as to the validity of Mrs.
25 Enomoto's signature.  The Court addressed the forgery issues in
   Section IV.A *supra*.

26     [25]  The Defendants' Post-Trial Brief at page 5 describes an
27 additional $20,810.17 in cashier's checks not included in Ex. D-54.
   Because no evidence of these checks was produced at trial and
28 because Mr. Forman did not refer to these checks in his testimony,
   the Court will not consider them.

Memorandum Decision - 53

receipts for the cashier's checks, and some copies of the back
sides of the cashier's checks are also included in Ex. D-54.[26]

Mrs. Enomoto testified that she did not authorize any of the
cashier's checks in Ex. D-54 except for two checks that were made
payable to her: one check in the amount of $6,000 in October of
2000 and another check in the amount of $6,000 in July or August of
2001. Mrs. Enomoto did not explain how these checks were obtained
from the bank and why she would have required cashier's checks from
her own companies. She believed that Ms. Thomas fabricated a
scheme to use cashier's checks to embezzle monies from Mrs.
Enomoto's companies while Mrs. Enomoto was in Arizona from October
of 2000 to July or August of 2001. Indeed, the time period for the
cashier's checks drawn on the accounts of Century Inc. and Mrs.
Enomoto's personal account coincides with her absence. The
withdrawal of monies from the CSH account, however, commenced in
March of 2000, well before Mrs. Enomoto left for Arizona.

Mrs. Enomoto admitted that after January of 2000, her
companies had no revenues or income. She claimed she was paying
operating expenses from personal funds she had in savings at
another bank. She then testified that she received cashier's
checks "from Mr. O'Flaherty" totaling $150,000 as reimbursement for
her payment of these operational expenses from personal funds.
This testimony was inconsistent with her testimony and that of Mr.
Forman that cashier's checks were not routinely used to pay
expenses.

---

[26] The copies are not complete and the parties disputed whose
fault it was that copies of the back side of each of the negotiated
cashier's checks was not available. The Court declined to resolve
this dispute at trial.

Memorandum Decision - 54

1    Mr. Forman relied on Mrs. Enomoto's contention that she did
2  not authorize the issuance of the cashier's checks and he therefore
3  made no investigation of the named payees on the checks to
4  determine if they were legitimate creditors of Century Inc., CSH or
5  Mrs. Enomoto or whether they actually received payment of the
6  funds.  On cross examination, Mr. Forman admitted that some checks
7  included in his binder should not have been because they were
8  payments to creditors.

9    The bank presented testimony equally lacking in credibility.
10  The bank attempted to show that Mrs. Enomoto authorized Jan Thomas
11  to procure cashier's checks while Mrs. Enomoto was in Arizona and
12  that the checks were used to pay the ongoing expenses of the
13  companies and Mrs. Enomoto.  The bank again relied on Ex. P-22A,
14  arguing that this document would have authorized Ms. Thomas to
15  obtain cashier's checks drawn on the Enomoto Entities' accounts.
16  The bank presented no evidence, however, that it was Jan Thomas who
17  procured all these cashier's checks.

18    A careful review of the documents in Ex. D-54 reveals that
19  many of the cashier's checks were signed by Rory O'Flaherty (*see,*
20  *e.g.,* Ex. D-54, Tab 3, p. 006325) but other checks were signed by
21  Kathy Kill.  *See e.g.,* Ex. D-54, Tab 2, p. 006317.  While at least
22  one, and possibly more, of the debit slips were signed by Jan
23  Thomas, *see, e.g.,* Ex. D-54, Tab 8, p. BBE12730, the overwhelming
24  majority of the debit slips appear to have been signed by Joe
25  Torres, an employee of the bank who, as noted in the RSM report,

26
27
28

Memorandum Decision - 55

reported to and worked closely with Mr. O'Flaherty.[27]  *See, e.g.,*
Ex. D-54, Tab 12, p. BBE12881 (which refers to "per Joe"), Tab 7,
p. BBE12673, Tab 9, p. BBE12747.  Some of the debit slips are not
signed at all.  *See, e.g.,* Ex. D-54, Tab 10, p. BBE12814.

Neither party produced any testimony describing the specific
procedure by which a cashier's check was obtained from the bank,
including what forms were required to be completed and by whom.
Neither party offered any evidence about the individuals whose
names appear on the debit slips as to whether these individuals
were bank employees or employees of the Enomoto Entities.  There is
no evidence that the bank's procedure would have permitted Jan
Thomas to request the issuance of cashier's checks by telephone and
no evidence that she ever did so.

A cashier's check is defined in RCW 62A.3-104(g) as "a draft
with respect to which the drawer and drawee are the same bank or
branches of the same bank."  Typically, a bank will charge the
amount of the cashier's check against its customer's account at the
time the cashier's check is issued by the bank.  Cashier's checks
play a significant role in the commercial world today.  Once
issued, a cashier's check represents an obligation of the bank and
no longer an obligation of the bank customer upon whose account the
check is drawn.  The payee may rely on the financial wherewithal of
the bank and not the sometimes unreliable financial condition of
the bank's customer.

Under the Uniform Commercial Code, as with other checks, the
bank may charge the customer's account for a cashier's check which

---

[27]  There is nothing in evidence to confirm, however, that
these are in fact Mr. Torres' signatures.

Memorandum Decision - 56

is "properly payable from" the customer's account. RCW 62A.4-401.
The bank has the burden of demonstrating that the charge is
authorized. In this case, the bank produced no evidence that the
issuance of the cashier's checks was authorized by the three
account holders: CSH, Century Inc., and Mrs. Enomoto. In addition,
the Court finds that the account statements did not provide
sufficient information describing these items such that Mrs.
Enomoto would have been able to identify mistakes or
misappropriations of funds from these accounts.

To determine how these cashier's checks would have appeared on
the bank account statements, the Court followed the progression of
nine checks which are shown on the list for CSH (p. 5 of 11, Ex. D-
54) as having been issued on March 6, 2001. These checks were
payable as follows: H.L Mahon ($6,000); J.M. Thomas ($2,500);
Karen Deland ($236.25); N. Cardenas ($205); Arete Designs ($1,800);
Bookkeeping Solutions ($735); 3D ($630); Dorothy Brumberg ($450);
Construction Consultants ($400). The checks total $12,956.25. The
request for the issuance of the checks appears in Tab 7 of Ex. D-
54, at p. BBE12673. The debit slip appears to be signed by Joe
Torres and shows only the total of $12,956.25, not the checks that
were actually issued. Credit copies of each of the checks that
were issued follow at pages BBE12673-BBE12680. The backs of the
checks are also included but are not legible enough for the Court
to discern any signature or endorsement on the back. Exhibit D-165
contains the bank statements for CSH at Tab 6. The $12,956.25
deduction from CSH's account on March 6, 2001 is shown on the
checking account statement for the period March 1, 2001 through
March 30, 2001 (p. BBE08308). Only the total amount appears, with

Memorandum Decision - 57

no reference to a particular check number and no reference to the
nine different checks that were actually issued.  Had regular
checking account checks been used, each would have appeared by
item, date cleared and amount.  The cancelled checks would have
been returned to the account holder, unlike cashier's checks, which
are not returned to the customer.

The Court finds that without proof the cashier's checks at
issue were validly authorized and requested by the account holders,
the checks should not have been charged against the accounts.
During the testimony, the defendants admitted that the following
cashier's checks drawn on the CSH account were authorized: $12,000
for two cashier's checks issued to Mrs. Enomoto and a cashier's
check payable to Radford & Co., a landlord, in the amount of $1,765
(Ex. D-54, Z-5, p. BBE 12599).  The Court finds that the following
amounts must be recredited by the bank to the accounts of CSH,
Century Inc. and Mrs. Enomoto as indicated below:

```
CSH: $593,772.71 less $13,765 (authorized checks) = $580,007.71
Century, Inc.:                                        78,779.02
Mrs. Enomoto:                                         67,031.99
Total:                                              $725,818.72
```

C.   Fraud.

1.   Elements of Fraud.

The defendants have the burden of proving the nine elements of
fraud: (1) representation of an existing fact; (2) materiality of
the representation; (3) falsity of the representation;
(4) knowledge of the falsity or reckless disregard as to its truth;
(5) intent to induce reliance on the representation; (6) ignorance
of the falsity; (7) reliance on the truth of the representation;
(8) justifiable reliance; and (9) damages proximately caused by the

Memorandum Decision - 58

fraud.  Fraud must be proved by clear, cogent and convincing
evidence.

    2.   <u>Alleged Fraud Related to the M Loan</u>.

    As noted above, this Court previously held that the Summary
Judgment was entitled to both *res judicata* and collateral estoppel
effect in this proceeding.  The Enomoto defendants asserted in the
state court action, in response to Banner Bank's motion for summary
judgment on the amount and validity of the M Loan, that the M Loan
was procured through fraud on the bank's part through the actions
of Mr. O'Flaherty.  *See* Defendants' Memorandum in Opposition to
Plaintiff's Motion for Summary Judgment, filed November 10, 2003.
The state court rejected this argument and entered the Summary
Judgment.  That judgment is binding in this case.  Because the
claim of equitable subordination, however, was not available to
Evergreen in the state court action, the Court will consider
Evergreen's allegations of fraud only in connection with that claim
made in this proceeding.  *See* Section F, *infra.*

    3.   <u>Alleged Fraud Related to the O Loan</u>.

    Mrs. Enomoto contends that when the O Loan was issued,
Mr. O'Flaherty fraudulently misrepresented to her that the proceeds
of the O Loan would be sufficient to pay off all of the existing
indebtedness of CSH, Century Inc. and Century Ltd.  The bank's
evidence shows the O Loan was made in August of 2000, but Mrs.
Enomoto claims the only valid note for O Loan advances she ever
signed was dated July 17, 2001.  *See* Ex. P-7-O.  According to the
evidence, the $490,000 O Loan proceeds would not have been
sufficient to pay off the corporate debt on either of those dates.

Memorandum Decision - 59

Mr. Wagner's materials in Ex. P-25, Tab 7, track the O Loan. The bank's ledger shows that the loan commenced in August of 2000, but the earliest promissory note in evidence related to the O Loan is a December 14, 2000 promissory note in the principal amount of $490,000. Ex. P-53. The note bears the signature of Mrs. Enomoto. The bank's ledger (Ex. P-25, Tab 7, p. 0148) shows that a principal advance was made on August 25, 2000 in the amount of $480,000. The Court, on page 49 *supra,* analyzed the disbursement of those funds: $50,000 was transferred to the H Loan on August 14, 2000, $86,128.09 was transferred to the K Loan on August 17, 2000, and the net amount of $337,614.90 (in two payments) was transferred to the H Loan on August 18, 2000.

| Loan | Principal Balance Before Payment | Principal Payment Amount | Principal Balance After Payment |
|------|----------------------------------|--------------------------|----------------------------------|
| H Loan | $775,000 (8/17/00) | $285,225[28] | $489,775 |
| K Loan | $370,844.48 (8/17/00) | $44,027.18[29] | $326,817.30 |
| Total | $1,145,844.48 | $329,252.18 | $816,592.30 |

The proceeds of the O Loan, assuming it was advanced in August of 2000, would not have been sufficient to pay off the H and K Loans, even if the entire advance of $480,000 had been applied to principal.[30]

---

[28] Of the $337,614.90 payment on the H Loan, $102,389.98 was applied to interest.

[29] Of the $86,128.09 payment on the K Loan, $42,100.91 was applied to interest.

[30] As of August 2000, only the H and K Loans had been advanced.

Memorandum Decision - 60

1   The proceeds of the O Loan would not have been sufficient to
2   retire all of the corporate debt in July of 2001, when Mrs. Enomoto
3   admits that she signed the O Loan Note.[31]  This is the only note
4   Mrs. Enomoto admits having signed related to the O Loan.  By that
5   date, according to the bank's loan ledger, the balance of the H
6   Loan was up to $496,775 (Ex. P-25, Tab 1A), the balance of the J
7   Loan was $599,934.10 (Ex. P-25, Tab 2), the balance of the K Loan
8   was $326,817.30 (Ex. P-25, Tab 3), and the balance of the L Loan
9   was $474,930.95 (Ex. P-25, Tab 4).  Thus, in July of 2001, the O
10  Loan proceeds of $480,000 would clearly not have been sufficient to
11  pay off the total corporate debt of $1,898,457.35.

12      Mrs. Enomoto claims that had the intercompany transfers not
13  been made, had the cashier's checks not been issued by the bank,
14  and had late charges and excess interest not been charged to her
15  companies, the O Loan proceeds would have been sufficient to pay
16  off the corporate debt.  These are breach of contract issues,
17  however, not fraud issues.  Mrs. Enomoto did not explain how
18  Mr. O'Flaherty's fraudulent misrepresentation of what the O Loan
19  would pay damaged her.  She did not prove that the interest rate on
20  the O Loan was higher than the interest rate on the loans that were
21  paid from the O Loan proceeds.  In essence, her execution of the O
22  Loan did nothing more than move indebtedness from one obligation to
23  another.  Mrs. Enomoto's claims with regard to the balances of her
24  corporate loans, including her claims as to the cashier's checks

25
26      [31]  Mrs. Enomoto contends that any note related to the O Loan
    which was signed prior to July 17, 2001 was a forgery.  As
27  described *supra* at p. 49, however, the $480,000 advance in August
    of 2000 which the bank contends was the initial advance under the O
28  Loan was shown on the CSH bank account statement for the period
    ending August 31, 2000.  Ex. P-25, Tab 7, p. 0152.

Memorandum Decision - 61

and intercompany transfers, have already been addressed by the

Court. Therefore, the Court concludes that even if Mr. O'Flaherty

fraudulently misrepresented that the O Loan would pay off Mrs.

Enomoto's corporate entities' debt, Mrs. Enomoto has not proved any

damage proximately caused by that misrepresentation.

    4. <u>Alleged Fraud Related to the P Loan</u>.

    Dr. Enomoto makes a similar fraud claim about the P Loan: that

Mr. O'Flaherty misrepresented to him that the P Loan proceeds would

be sufficient to pay off all of Evergreen's corporate debt. It was

necessary to pay off the Evergreen debt, according to Dr. Enomoto,

to make Evergreen's balance sheet more attractive to Swedish

Hospital in a proposed transaction under discussion in the summer

of 2000 in which the Evergreen clinic would be purchased by

Swedish. Dr. Enomoto never testified that the Swedish Hospital

transaction fell apart because Evergreen's corporate debt was not

paid from the proceeds of the P Loan. On the contrary, Mrs.

Enomoto testified that the Swedish transaction never materialized

for reasons completely unrelated to Evergreen's balance sheet or

debt levels.

    Dr. Enomoto further contends that had the P Loan proceeds paid

off Evergreen's debt in full, then the M Loan would not have been

necessary at all. This has nothing to do with fraud, however.

Rather, it has to do with the breach of contract claims raised by

Dr. Enomoto and Evergreen. Dr. Enomoto entered into the M Loan

over a year after the P Loan was made. If Dr. Enomoto thought the

P Loan had paid off all of Evergreen's debt in August of 2000, he

should have asked for a complete accounting before signing the M

Loan note.

Memorandum Decision - 62

1  For the foregoing reasons, the Court rejects Dr. Enomoto's

2  fraud claim.

3  D.  Breach of the Duty of Good Faith and Fair Dealing.

4  The Court need not decide whether, as argued by the

5  defendants, Banner Bank breached a good faith requirement inherent

6  in the banking relationship.  The facts of this case do not

7  demonstrate that either side in this litigation deserves the

8  benefit of this doctrine.  Dr. and Mrs. Enomoto failed to

9  adequately supervise the employees they put in charge of their

10  finances, failed to notify the bank of errors in and problems with

11  their deposit and loan accounts, and failed to disclose to bank

12  officers the concerns they had specifically about Jan Thomas.  The

13  bank, on the other hand, failed to adequately supervise Mr.

14  O'Flaherty who was thereby able to manipulate customer accounts.

15  Given the failures of both parties, the Court rejects the notion

16  that either side is entitled to any damages on account of the

17  breach of the duty of good faith in contract dealings.

18  E.  Overdraft Charges, Late Fees, and NSF Charges.

19  The defendants argue that because it was Mr. O'Flaherty

20  controlling the flow of funds from and between their loan accounts

21  and between their checking accounts, they should not have to bear

22  those charges that accrued because of transfers that Mr. O'Flaherty

23  made.  These charges include:  $10,607.76 in late fees, $6,122.23

24  in overdraft interest charges and $58,090 in NSF (Not Sufficient

25  Funds) charges.  The Court has found that the defendants

26  participated in and ratified many of the transactions giving rise

27  to these fees.  Thus, the fees will not be disallowed in total.

28  Instead, based upon the Court's holding that cashier's checks were

Memorandum Decision - 63

not properly issued from certain accounts, the Court will disallow late fees, overdraft interest charges and NSF charges applied to the accounts of CSH between March 21, 2000 and September 25, 2001, to the accounts of Century Inc. between October 3, 2000 through May 31, 2001 and to the accounts of Mrs. Enomoto between August 28, 2000 through June 6, 2001. These amounts are set forth in various exhibits and can be calculated by Mr. Forman with verification by Mr. Wagner.[32]

F.   Equitable Subordination.

Evergreen must prove by a preponderance of the evidence all of the elements of equitable subordination, which include that Banner Bank engaged in inequitable conduct, that the conduct injured creditors or gave an unfair advantage to Banner Bank, and that subordination of the bank's claim is not inconsistent with the Bankruptcy Code. *In re Castletons, Inc.*, 990 F.2d 551 (10th Cir. 1993); *In re Le Café Creme, Ltd.*, 244 B.R. 221 (Bankr. S.D. N.Y. 2000). Equitable subordination is an unusual remedy which should be applied only in limited circumstances. *In re Lazar*, 83 F.3d 306, 309 (9th Cir. 1996).

Evergreen contends that the bank acted fraudulently when it failed to advise Dr. Enomoto of Mr. O'Flaherty's improper account manipulations at or before the time he signed the M Loan Note in December of 2001. The bank first learned of Mr. O'Flaherty's improper actions around September 1, 2001 after which it formally hired RSM to investigate Mr. O'Flaherty's activities and prepare a

---

[32]   The Court held in paragraph 2.b *supra* that certain check handling and overdraft interest charges be deducted from the N Loan balance.

Memorandum Decision - 64

report for the bank.  The RSM Report was issued on November 19,
2001, about a month before the M Loan note was signed on
December 19, 2001.  Thus, by that time, the bank had the
information contained in the RSM Report, Ex. D-111.

Dr. Enomoto testified that had he known of Mr. O'Flaherty's
actions, he would have asked the bank for a complete accounting and
would have sought other sources of financing.  He also admitted,
however, that under the M Loan Note he was going to get a better
interest rate and the monthly payments would be lower than under
the two pre-existing loans, numbers 169013067 and 169030236. The
interest rate under the M Loan Note was 8% per annum.  *See* Ex. P-5-
O.

There is no evidence that Dr. Enomoto had any other source of
financing at that time or that he had any ability to repay the
bank's existing debt, which was consolidated into the M Loan.  At
the September 2001 meeting, it should have been apparent that the
relationship between the Enomotos and Banner Bank was falling
apart.  Mr. Goddu's demand letter of September 27, 2001 to the
Enomotos should have been sufficient incentive for Dr. Enomoto to
begin looking for alternative financing.

There is no evidence of any damage that Evergreen or creditors
of Evergreen suffered as a result of the execution of the M Loan.
The loan merely consolidated two loans made previously by the bank
to Evergreen into a single loan with a lower interest rate.

Evergreen also contends that the bank should have advised
Dr. Enomoto at the time the M Loan documents were signed that the
bank's UCC-1 financing statement perfecting its security interest
in the Collateral had lapsed.  Evergreen has not provided any legal

Memorandum Decision - 65

authority for that contention and the Court rejects the notion that a lender has an obligation to disclose such a fact.  There is no evidence as to how other creditors were disadvantaged by Banner Bank's re-perfection of its security interest through the execution of another UCC-1 financing statement at the time the M Loan was signed.  Evergreen, as the borrower, negotiated for a secured loan with the bank and that is what it received.  There is no evidence of any intervening creditor who has been harmed by the refiling of the bank's UCC-1 financing statement.

The Court finds that Evergreen has not met the elements required to prove that the bank's claim should be equitably subordinated.

G.   Other Claims.

The defendants asserted a variety of other affirmative defenses and counterclaims which this Court concludes they have failed to prove.

1.   Ultra Vires Action by the Bank.

An ultra vires act is "a contract, act, or transaction of a corporation which is beyond the express or implied powers of the corporation under any circumstances or for any purpose." Ballentine's Law Dictionary (3rd ed. 1969).  At most, the defendants demonstrated that Mr. O'Flaherty's conduct violated some of the bank's internal procedural guidelines.  This evidence does not prove that the bank acted beyond its *corporate* powers.

2.   Satisfaction and Release.

The defendants assert the affirmative defense of satisfaction and release, which requires "a writing providing that a duty owed to the maker of the release is discharged immediately or on the

Memorandum Decision - 66

occurrence of a condition." Restatement (Second) of Contracts
§ 284(1)(1979). "A satisfaction occurs when the injured party
receives full compensation for the harm inflicted." *De Nike v.
Mowery*, 69 Wn.2d 357, 366 (1966). The defendants failed to prove
that the debts they owe the bank have been satisfied or that the
bank affirmatively released them from those debts.

    3. <u>Undue Influence/Coercion/Duress/Business Compulsion</u>.

The defendants attempted to show that Mr. O'Flaherty's control
over their accounts amounted to an undue influence, duress,
coercion or business compulsion. To avoid a transaction on account
of undue influence or control, the proponent must show that "[o]ne
party is under the domination of another, or by virtue of the
relation between them is justified in assuming that the other party
will not act in a manner inconsistent with his welfare...."
*Gerimonte v. Case*, 42 Wn. App. 611, 613 (1986). Such undue
influence must be proved by clear, cogent and convincing evidence.
*Id.* at 615. Similarly, an actionable claim of duress requires
proof that "a person was deprived of his free will at the time he
entered into the challenged agreement in order to sustain a claim
of duress." *Retail Clerks Health & Welfare Trust Funds v. Shopland
Supermarket, Inc.*, 96 Wn.2d 939, 944-45 (1982). The fact that a
contract is entered into under stress of pecuniary necessity does
not constitute business compulsion. *Puget Sound Power & Light Co.
v. Shulman*, 84 Wn.2d 433, 443 (1974)("The assertion of duress must
be proven by evidence that the duress resulted from defendant's
wrongful and oppressive conduct and not by plaintiff's
necessities." *Id.* (quoting *Rosellini v. Banchero*, 8 Wn.App. 383,
387 (1973)).

Memorandum Decision - 67

1   The defendants attempted to demonstrate that they were forced
2   to sign incomplete loan documents, blank signature pages, and other
3   documents because they were pressed for time and because they
4   trusted Mr. O'Flaherty.  Both Dr. and Mrs. Enomoto are highly
5   educated, professionally trained individuals.  They signed
6   documents in Evergreen's offices where they could have read the
7   documents carefully and copied each document they signed.  The fact
8   that they had no other financing option did not put them under the
9   kind of duress required under the foregoing theories.  The Enomotos
10  had the opportunity to pay close, personal attention to their
11  finances, to ask intelligent questions if they did not understand
12  the terms of the documents they were asked to sign, to request
13  copies and other documents from the bank, and to memorialize their
14  concerns and questions in writing to the bank.  There is no
15  evidence that the Enomotos did any of these things.  Accordingly,
16  the Court rejects the duress-type defenses and counterclaims
17  asserted by the defendants.

18      4.  Breach of Fiduciary Duty.

19      To prove a defense or counterclaim for breach of fiduciary
20  duty, the defendants must establish (1) the existence of a duty
21  owed [to them]; (2) a breach of that duty; (3) a resulting injury;
22  and (4) that the claimed breach was the proximate cause of the
23  injury." *Miller v. United States Bank, N.A.*, 72 Wn. App. 416, 426
24  (1994)(citation omitted).  "To establish a fiduciary relationship
25  upon the violation of which fraud is sought to be based, there must
26  be something more than mere friendly relations or confidence in
27  another's honesty and integrity.  There must be something in the
28  particular circumstances which approximates a business agency, a

Memorandum Decision - 68

professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise." *Collins v. Nelson*, 193 Wn. 334, 345 (1938). As a general rule, "the relationship between a bank and a depositor or customer does not ordinarily impose a fiduciary duty of disclosure upon the bank. They deal at arms length." *Tokarz v. Frontier Fed. Sav. & Loan Assoc.*, 33 Wn.App. 456, 458-59 (1982).

The defendants argue that because Mr. O'Flaherty was controlling transfers of their funds, this by itself created a fiduciary relationship between him and the various borrowers. The Court disagrees. The defendants were involved in very standard commercial relationships of lender and borrower and bank and depositor. As previously noted, they were not dominated by Mr. O'Flaherty nor did they establish any other reason why a fiduciary relationship would arise between them and the bank.

5.    <u>Interference with Business Opportunity</u>.

The defendants have claimed that Banner Bank tortiously interfered with a business expectancy of the defendants in that the bank prevented the IRB financing that would have allowed CSH/Century to complete The Glen project. Specifically, the defendants claim that because the bank refused to send regular monthly account and loan statements for Century Inc. and CSH, those entities were unable to close the bond financing. In addition, Mrs. Enomoto testified that the bank failed to fund the purchase of what she referred to as two "sliver" lots of property that were critical to the overall success and value of The Glen and that as a result the value of the project was decreased. Mrs. Enomoto

Memorandum Decision - 69

testified that these lots were $50,000 apiece and that she was
advised by Mr. O'Flaherty that the purchase was a "done deal."  The
defendants claim that they lost $2.4 million in profits as a result
of the bank's tortious interference with the IRB financing
opportunity.

In order to prove a claim for tortious interference, the
defendants must prove (1) the existence of a business expectancy;
(2) Banner Bank's knowledge of that expectancy; (3) an intentional
interference inducing or causing termination of the expectancy;
(4) by improper purpose or means; and (5) resulting damage to
defendants.  *Leigang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d
133, 157 (1997).

The defendants failed to prove the existence of any industrial
revenue bond opportunity.  There is no competent evidence in the
record of such an opportunity, nor is there any evidence of any
intentional interference by the bank with such an opportunity.
Moreover, this Court agrees with the bank that, given the financial
condition of these borrowers, it is unlikely that the bank would
have intentionally prevented the defendants from obtaining a loan
that would have paid the bank off.  If anything, the evidence
suggests that the failure of the defendants to obtain alternative
financing arose from their failure to maintain adequate bookkeeping
and accounting records.[33]

---

[33]  With regard to the purchase of the "sliver" lots for The
Glen, the Court concludes that the failure of the purchase was due
to the failure of CSH employees to pursue the necessary closing
actions in order to complete the sale rather than as a result of
any failure by the bank.  Mrs. Enomoto so much as admitted this.
*See* Mrs. Enomoto testimony on February 17, 2005; Testimony of Wendy
Eklund (Rainer Title) on January 26, 2005.

Memorandum Decision - 70

1    6.   Failure of Consideration.

2        Although defendants pled failure of consideration as an
3   affirmative defense, they have not explained how that theory would
4   apply specifically to the facts of this case.  As noted above, the
5   Court concludes the amounts due the bank under the various notes
6   and guaranties are supported by fair consideration: the defendants
7   received the funds which were loaned and the Court is satisfied
8   that those funds have been traced into the defendants' hands.

9        7.   Defendants' Claim For Punitive Damages.

10       In closing argument, counsel for the non-debtor defendants
11  requested that the Court award punitive damages in the defendants'
12  favor in the amount of $750,000.  As far as this Court can
13  ascertain, this number was arrived at arbitrarily and the
14  defendants have cited no authority for the Court to impose punitive
15  damages on the bank under the circumstances of this case.
16  Therefore, this Court declines to use its general equitable powers
17  under Bankruptcy Code § 105 to order punitive damages where there
18  is no case law or other statutory authority for doing so.[34]

19                            **CONCLUSION**

20       Counsel for Banner Bank is instructed to prepare an accounting
21  of the amount owed under each note described in Section D *supra*
22  based upon the Court's ruling.  Counsel for the defendants is
23  instructed to calculate the amount of each offset found by the

24

25

26  _____
27       [34]   The defendants also pled causes of action for estoppel,
    novation, and negligent accounting of monies owed.  The Court has
28  not discussed these theories because they were not demonstrated to
    be specifically applicable to the facts presented at trial.

    Memorandum Decision - 71

1  Court with interest from the date the offset arose.  The Court will

2  conduct further hearings to resolve any disputed amounts.

3       DATED this 19th day of October, 2005.

4

5                                   _____

6                                   KAREN A. OVERSTREET
                                    UNITED STATES BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Decision - 72